PROSPER R. MEEKER, by HARRY MEEKER, Next Friend, v. UNION ELECTRIC LIGHT & POWER COMPANY, Appellant.

In Banc, November 17, 1919.

1. **NEGLIGENCE: Separate Acts: Allegations: Proof of One: Electric Wire.** A petition alleging that "defendant negligently and carelessly permitted one or more of its said wires charged with electricity, to become uninsulated and broken in two, and to fall to the surface of said alley and to remain broken in two and down while fully charged with electricity, when it knew, or ought by the exercise of the highest degree of care and caution to have known, that they were so uninsulated and broken and down," charges three acts of negligence, namely, negligently permitting said wires (1) to become uninsulated, (2) to break in two and (3) to fall to the ground; and plaintiff was not required to prove all three charges, but if he proved that the wire became uninsulated or broken in two, and remained in that condition for such a length of time as to have enabled defendant to discover the defect by the use of proper care, then defendant is liable to a pedestrian who stepped upon the wire, even though it was not down for more than a moment.

2. ———: **Uninsulated Electric Wire In Alley: Notice: Proximate Cause.** Substantial evidence that defendant was repeatedly notified that its electric wire was defective, spluttering and making blue light, and had ample time to have repaired it before it broke in two and fell in the alley and neglected to do so, is sufficient to charge defendant with gross negligence; and if after such notice, and the breaking and falling of the wire, a boy, running through the alley, came in contact with it and was injured, defendant is liable in damages for his injuries, even though the wire had fallen only a few moments before he came in contact with it and defendant had no notice that it was actually down; for in such case, neglect to repair the defective wire after repeated notice or after ample time to have discovered its defective and dangerous condition, was the proximate cause of the boy's injury. Under such circumstances the length of time the wire was down was wholly immaterial.

3. ———: **Separate Acts: Proof of One: Instructions: Broadening Issues.** Where plaintiff's petition charges three separate acts of gross negligence, proof of any one of them which was the proxi-

mate cause of his injury will justify a verdict in his favor; and an instruction which submits the three charges alleged, does not broaden the issues.

4. ——: **Evidence: Telephone Communication.**  Where an electric light company had a telephone in its office with a given number and said number was published in the telephone directory, and a user of said telephone called said number and some one answered by giving the name of the company, a communication then imparted to the said company that its electric wires in a certain locality were crippled, to which the reply came, "All right; we will attend to it," is admissible evidence in a subsequent action for damages by a boy who was burned by one of said crippled wires, even though the witness did not know the name of the person who answered for the company.

5. **VERDICT: Excessive: $35,000.**  Plaintiff came in contact with one of defendant's electric wires, and was badly burned in his hands, arms, chest, abdomen, back and upper legs;  one hand was amputated at the wrist;  he has very imperfect use of the fingers of the other hand, but the upper part of the arm is dead, and the constrictions are such that it has become fastened to the skin of the body, and that condition can never be remedied;  the burns about the chest and abdomen were so severe that the cavity of one lung and the abdominal cavity are permanently constricted; he can never use his remaining hand for any kind of work;  he suffered indescribable nervous agony for several months, and all his life he must be a broken, helpless and suffering cripple. The jury returned a verdict for $50,000, which was by the trial court reduced to $35,000.  *Held*, that the judgment for $35,000 will not be disturbed.

Appeal from St. Louis Circuit Court.—*Hon. Rhodes E. Cave*, Judge.

AFFIRMED.

*Jourdan, Rassieur & Pierce* for appellant.

(1) The court erred in refusing to give the instructions in the nature of a demurrer to the evidence. Beave v. Transit Co., 212 Mo. 352;  State ex rel. National Newspaper Assn. v. Ellison, 176 S. W. 11;  Degonia v. Railroad, 224 Mo. 564;  State ex rel. v. Ellison, 270 Mo. 645;  Bank v. Murdock, 62 Mo. 70;  Mansur v. Botts, 80 Mo. 651;  Black v. Railroad, 217 Mo. 672;

Tinkle v. Railway Co., 212 Mo. 445; Eads v. Galt Tel. Co., 199 S. W. 710; McGrath v. Transit Co., 197 Mo. 97. (2) The court erred in giving plaintiff's instruction numbered 1: (a) Because said instruction takes a wider range and is broader than the allegations of negligence in the petition. Authorities, supra. (b) Because said instruction uses the word "negligently" without any explanation or definition of its meaning, thus leaving the jury to apply its notions of what was intended by the use of the word. Raybourn v. Phillips, 160 Mo. App. 535. (3) The court erred in permitting the witness Meyer to testify to an alleged telephone conversation supposed to have been had with a representative of the company, although the witness admitted that he did not know whom he was talking to. Strack v. Telephone Co., 216 Mo. 614. (4) The court erred in refusing to set aside the verdict *in toto* because it was excessive, and because the judgment for $35,000 is still excessive. Campbell v. United Rys. Co., 243 Mo. 142; Partello v. Railroad, 217 Mo. 645; Chlanda v. Transit Co., 213 Mo. 244; Finnegan v. Mo. Pac. Ry., 244 Mo. 608, 261 Mo. 481; Freeman v. Tel. Co., 160 Mo. App. 271.

*Henry G. Miller, Samuel W. Baxter* and *Charles E. Morrow* for respondent.

(1) The plaintiff did not have to prove all the assignments of negligence, but only enough of the acts of negligence charged to make a case. Van Horn v. Transit Co., 198 Mo. 481; Newlin v. Railroad, 222 Mo. 393; Gannon v. Gas Light Co., 145 Mo. 511; Moyer v. Railroad, 189 S. W. 842; Spalding v. Met. St. Ry. Co., 129 Mo. App. 607; Dutro v. Met. St. Ry. Co., 111 Mo. App. 264; Hoffman v. Walsh, 117 Mo. App. 278; McMurray v. Oil & Gas Co., 159 Mo. App. 623; Yost v. Atlas, 191 Mo. App. 434; Mullery v. Tel. Co., 191 Mo. App. 126, 127. (2) The defendant negligently permitted the wires to become uninsulated and to break in two and fall to the surface of the alley. To make a

case plaintiff did not have to prove that they were down for such a length of time that defendant knew or ought to have known it and remedied the danger.  Hoover v. Railway Co., 159 Mo. App. 421;  Booker v. Railroad, 144 Mo. App. 273;  Heberling v. Warrensburg, 204 Mo. 618.  (3) Where a petition charges that the defendant negligently committed a particular act, it furnishes the predicate for the proof of all incidental facts and circumstances, both of omission and commission which tend to establish the negligence of the primary fact complained of.  Fisher v. Golladay, 38 Mo. App. 538;  Olsen v. Railroad, 68 Minn. 155;  Reynolds v. Van Beuren, 64 N. Y. Supp. 724;  Henry v. Navy Yard Route, 94 Wash. 526;  Kennedy v. Hawkins 102 Pac. (Ore.) 733, 25 L. R. A. (N. S.) 606;  Jones v. City of Portland, 35 Ore. 512;  Ware v. Gay, 11 Pick. 106;  McCauley v. Davidson, 10 Minn. 418;  Clark v. Railroad, 15 Fed. 588;  Grinde v. Railroad, 42 Iowa, 376;  Indianapolis Ry. Co. v. Keeley, 23 Ind. 133.  (4) Plaintiff's instruction No. 1 was within the purview of both the petition and the evidence and has been approved.  Booker v. Railroad, 144 Mo. App. 282.  (a) Instruction No. 1 required the jury to find every fact necessary to make the defendant guilty of the negligence charged, and the fact that it used the word "negligently" without defining it does not render the instruction bad, for it states all the elements of actionable negligence.  Sweeney v. Kansas City Cable Ry. Co., 150 Mo. 385;  Mather v. Railroad, 166 Mo. App. 142;  O'Leary v. Kansas City, 127 Mo. App. 77;  Rattan v. Railway, 120 Mo. App. 279;  Burns v. Railroad, 76 Mo. App. 342;  Anderson v. American Sash & Door Co., 182 S. W. 820.  (b) The meaning of the word negligently is well understood and no definition of it was necessary. Sweeney v. Kansas City Cable Ry. Co., 150 Mo. 401. (c) The word "negligently" used in this instruction without definition merely characterized the act and is not improper.  Mather v. Railroad, 166 Mo. App. 149; Burns v. Railroad, 176 Mo. App. 330-342;  Anderson

v. American Sash & Door Co., 182 S. W. 820. (d) If the defendant desired a definition of the term "negligently," used in said instruction, it was its duty to ask an instruction defining it. Quirk v. Elevator Co., 126 Mo. 293. (e) But the defendant cannot complain of the alleged error, if any, in the use of the word "negligently" in this instruction, without defining it because the same term was used by the defendant in instruction A, given by the court at its request, in reference to the negligence of the defendant and was likewise so used in instruction 2, asked by the defendant and refused by the court. Quirk v. Elevator Co., 126 Mo. 279; Grocery Co. v. Smith, 74 Mo. App. 424; Herman v. Owen, 42 Mo. App. 392; Anderson v. American Sash & Door Co., 182 S. W. 820. (5) There was no total failure of proof in this case. On the contrary, the facts proven make the defendant liable for plaintiff's injury. It is not even contended that the facts proven, if found by the jury to be true, will not entitle the plaintiff to recover under the law. The evidence was admitted without objection or exception. The defendant remained silent and made no claim or affidavit of surprise, and does not even claim in its motion for new trial that its demurrer to the evidence should have been given. Under these circumstances, even if the evidence tended to prove a cause of action different in some respects from the one alleged in the petition, which we deny, the court should have treated the matter as an immaterial variance and submitted by instructions the question of liability in accordance with the proof made. R. S. 1909, sec. 1846; Chouquette v. Southern Elec. Ry. Co., 152 Mo. 257; Mellor v. Mo. Pac. Ry. Co., 105 Mo. 455; Ridenhour v. Kansas City Cable Ry. Co., 102 Mo. 270; Crawford v. Stock Yards Co., 215 Mo. 394; Harrison v. Lakeman, 189 Mo. 581; Chamlee v. Planters Hotel Co., 155 Mo. App. 158; Bowles v. Railroad, 167 Mo. App. 272; Hensler v. Stix, 113 Mo. App. 162; Litton v. Railroad, 111 Mo. App. 140; Parsons v. Quinn, 127

Mo. App. 525.   (6) The court did not commit error in refusing to strike out the testimony of the witness Meyer. Wolf v. Railroad, 97 Mo. 473;   Globe Printing Co. v. Stahl, 23 Mo. App. 451; Publishing Co. v. Warehouse, 123 Mo. App. 18.   This evidence was competent, although the witness did not know the person to whom he *was* talking, just as much as if the witness had gone personally to the defendant's "trouble department" and talked to this same person in charge of it, whose name he did not know.   Reed v. Railroad, 72 Iowa, 166.   (a) But defendant did not object to the question asked this witness at the time; made no objection to the admission of this testimony, but took the chance of a favorable answer, and when the answer came from the witness adverse to it, moved to strike out the testimony. The competency of this evidence was waived and the motion came too late.   Roe v. Bank of Versailles, 67 Mo. 426;   State v. Marcks, 140 Mo. 668;   Mann v. Balfour, 187 Mo. 290;   Maxwell v. Railroad, 85 Mo. 106; Foster v. Railroad, 115 Mo. 165;   Drainage District v. Railroad, 266 Mo. 71;   Lutz v. Met. St. Ry. Co., 123 Mo. App. 499;   Thomas v. Met. St. Ry. Co., 125 Mo. App. 131;   Utz v. Insurance Co., 139 Mo. App. 552; Osborn v. Railroad, 144 Mo. App. 119;   Compressed Air Co. v. Fulton, 166 Mo. App. 27;   Dehmer v. Miller, 166 Mo. App. 513.   (b) The defendant nowhere assigned in its motion for new trial the refusal to strike out this testimony as an error and cannot raise the question now in this court.   Salmons v. Railroad, 271 Mo. 402.   (7) The verdict of $50,000 was not excessive and the judgment of $35,000, after *remittitur,* is not excessive.   Finnigan v. Railroad, 261 Mo. 481;   Corby v. Telephone Co., 231 Mo. 447, 448;   Hill v. Union Electric Co., 260 Mo. 99;   Clark v. Railway Co., 234 Mo. 396;   Hollenbeck v. Railroad, 141 Mo. 113;   Henderson v. Kansas City, 177 Mo. 477;   Chitty v. Railroad, 166 Mo. 435;   Dougherty v. Railroad, 97 Mo. 647; Hamilton v. Rich Hill Mining Co., 108 Mo. 364;   Wald-

hire v. Railroad, 87 Mo. 37; Scullin v. Railroad, 184 Mo. 695; Myers v. City of Independence, 189 S. W. 816; Miller v. Harpster, 201 S. W. 854; Salmons v. Railway Co., 197 S. W. 35; Breen v. United Rys. Co., 204 S. W. 52; Shaw v. Kansas City, 196 S. W. 1091; Hubbard v. Wabash Ry. Co., 193 S. W. 579.

WOODSON, J.—The plaintiff brought this suit in the Circuit Court of the City of St. Louis against the defendant, to recover the sum of seventy-five thousand dollars for personal injuries received by him through the alleged negligence of the defendant. The trial resulted in a judgment for the plaintiff in the sum of $50,000, which upon motion by the defendant was by the court reduced to $35,000. After taking the proper preliminary steps therefor, the defendant duly appealed the cause to this court.

The charging part of the petition was as follows:

"The defendant negligently and carelessly permitted one or more of its said wires then and there charged as aforesaid, to become uninsulated and broken in two, and to fall to the surface of said alley, and to remain broken in two and down then and there while fully charged with electricity as aforesaid, when it knew, or ought by the exercise of the highest degree of care and caution to have known, that said wires were so uninsulated and broken and down as aforesaid, and liable if touched by any human being while so uninsulated, broken and down and charged as aforesaid, to cause serious injury or destroy human life."

The petition then alleges that while said wires were thus in said alley, "uninsulated, broken in two and down and charged with electricity as aforesaid," the plaintiff, while walking along in said alley, came in contact with said wires, and was thereby violently precipitated to the ground and seriously, painfully and permanently injured. He sues for $75,000 damages.

After the general denial the answer contained the following:

"Further answering, defendant states that, although plaintiff saw, or by the exercise of ordinary care on his part might have seen, that the wire referred to in the petition had burned through and that one end was lying in the alley, and although he was warned not to touch it because it was dangerous to do so, and well knowing that there was such danger, he nevertheless approached it or came in contact with it and his negligence, in the above particulars, was the proximate cause of his injuries or directly contributed thereto."

There is no controversy as to what the evidence of the plaintiff tended to prove, but there were numerous objections made and preserved as to the competency and relevancy of much of that evidence; and I will therefore set out the substance of the testimony of the witnesses as preserved in the record, and thereafter pass upon the objections thereto saved.

The plaintiff was about fourteen years of age at the date of the injury which occurred in the City of St. Louis on June 15, 1915.

The defendant, Union Electric Light & power Company, is a corporation, engaged in the business of furnishing and selling electric light and power in said city. In certain portions of St. Louis it strings its wires upon poles and such wires extend along, over and across streets and alleys. On the date in question and for a long time prior thereto, the defendant maintained a wire carrying 2,200 volts of electricity, along a public alley running east and west from Clifton Avenue to Tamm Avenue, in the southwestern part of St. Louis, and in the rear of a number known as 6273 Magnolia Avenue. Surrounding this alley are streets as follows: Clifton Avenue, running north and south; Magnolia Avenue, running east and west; Columbia Street, running east and west, and Tamm Avenue, running north and south. The wire in question was strung on poles on the south side of the alley and at a point in the rear of 6273 Magnolia Avenue; it crossed the alley diagonally and extended through the top of a tree. Nearby, located upon the cross-arms of

one of the posts, was a transformer, the purpose of which was to reduce the current carried on the primary wire, that is, the 2,200 volts, to 110 and 220 volts in order that it might be distributed to residences and business houses nearby, for electric lighting and other purposes. Such distribution was made to a saloon conducted by Charles Meyer, at 6400 Old Manchester Road, about 125 feet from the point where the accident occurred; and to the residence of Mrs. G. B. Huffington, 6233 Magnolia Avenue, as well as to the residence of other persons residing in that neighborhood.

About two weeks previous to the accident Mrs. Joseph Stewart, who then lived at 6273 Magnolia Avenue, and whose rear gate opens on the alley at the point where the plaintiff was injured, noticed the electric wire which ran in the rear of her house and at the place where the boy was injured, burning like a street car wire would be "when the trolley would be off." Her house sat some distance back from the alley and she was sitting in her bedroom rocking her baby. The boughs of the trees were waving and every time the tree rubbed against the wire it would cause a flash and a flame to be thrown sufficient to light up the bedroom in which she sat. The flashes and flames would occur when the wind blew the tree against the wire. After the accident she saw the limb and it looked as if it were dead, and there was a groove in it about the size of the wire, indicating where the wire had rubbed.

Miss Gertrude Castle, who resided at 6263 Magnolia Avenue, noticed, two days before the accident, that at a point close to the pole, to which the wire in question was attached, there was no insulation upon the wire; that it was in a sizzling condition and cast a blue flame. On the Sunday preceding the Tuesday on which the accident occurred, there had been an electrical storm and Miss Castle and her mother, Mrs. G. B. Huffington, heard a sizzling sound and saw a blue flame flashing from the wire at the pole outside of the house, in this alley and at the point where the wire subsequently broke. They

discovered that the electric lights in their house were not burning. Miss Castle looked up the defendant's number in the telephone book, placed the call and was answered by a lady, who said, "Union Electric Light & Power Company." Miss Castle told her that the lights were out and asked her to attend to it. The person speaking for the Union Electric Light & Power Company said, "Just a moment; I will speak to the man who has charge of that division," and a moment later she said, "Yes; someone will be out to fix them this afternoon."

The record discloses the fact that this witness, as well as all the others who testified that they called the defendant over the telephone to complain of the defects or the troubles they were having with the wires and 'phones, had no personal knowledge of the persons who answered the 'phone, or who they represented, except that they presumed that they were agents of the defendant from the facts that they called its number and the response came therefrom. This evidence was objected to and exception duly saved.

This was about one o'clock. About four o'clock Miss Castle again tried the lights and found they were not on and she telephoned again to the Union Electric Light & Power Company, got the same party, who told her the same thing, and about six o'clock the lights were on. The sizzling noise and the popping which she heard, continued throughout the day and was about as loud as a fire cracker.

This occurred on Sunday, June 13th. The accident happened about four o'clock on the afternoon of Tuesday, June 15th.

For ten days or two weeks before that Sunday, she had noticed that the lights in the house would be off sometimes as long as three or four minutes. At other times they would gradually get dimmer and dimmer, until the wires in the incandescent were just a red glimmer, then gradually get brighter. When Miss Castle telephoned to the defendant company she told it that the wires were defective, and the party answering the

telephone stated that some one would be out. The statement of Miss Castle is corroborated in every particular by that of her mother, Mrs. G. B. Huffington, with whom she resided. Their house was located fifty feet back from the alley, and there were three houses on lots forty feet wide, between the Huffington house and the point where the sizzling noises were heard and where the accident occurred. Mrs. Huffington heard this noise continuously from Sunday, the 13th, to Tuesday, the 15th, about 11 o'clock, at which time she left home.

Charles F. Meyer, who conducted the saloon at 6400 Old Manchester Road, about one hundred or one hundred twenty-five feet from the point where plaintiff was injured, and who received power and light from the wire in this alley which subsequently broke and caused the injury to Prosper H. Meeker, noticed, a week or ten days before the accident, that the wires were slack and that every time the wind blew the wires would touch, and such contact would cause his lights to go out or flicker. He could see the wires from his bedroom and noticed a blue flame thrown from the wires every time they came in contact. At one time it threw a blue flame the same as "if a trolley wire got off the trolley." Meyer got the telephone books, found the telephone number of the Union Electric Light & Power Company, called it on the phone, and asked if he was talking to the Union Electric Light & Power Company, and was informed by the person at the phone that he was. He then said, in the telephone conversation, that his lights were out; "that there was something wrong on the outside." He called the trouble department of the Union Electric Light & Power Company twice and made similar reports. On another occasion he had James Crecelius call the defendant on the phone and make a similar report. The first time he called the defendant he reported that he didn't have power and the answer was, "We will attend to it." These reports were made by Meyer to defendant a week or ten days before the injury was sustained by Prosper H. Meeker, and at that time it was evident that the wires

which later became burned and broken in two and fell to the surface of the alley were uninsulated, sagging together, producing flashes, making popping and sizzling noises and causing the lights in dwelling and business houses to flicker, grow dim and go out. Defendant was repeatedly informed of this condition. There was no insulation upon the wire at all between Meyer's place of business and the pole for a long time prior to the time the wires burned through and fell to the ground. The insulation was hanging down in strings. This was the wire with which plaintiff came in contact when it, due to its uninsulated condition and its sagging and touching wires, became burned, broken in two and fell to the surface of the alley. The second time he telephoned to defendant he specifically stated that the wire in the alley was throwing blue flames, and the reply was that they would attend to it. This conversation occurred four or five days before the accident.

James Crecelius likewise called the defendant on the telephone and reported the lights out at Meyer's place, five days before the accident. He, too, called the number of the Union Electric Light & Power Company on the telephone, obtained a response and was referred to the trouble department. Crecelius is a man who has electrical knowledge and he discussed the situation with the company's representative on the phone at the time. Crecelius told him positively that there was nothing wrong with the lights on the inside. The defendant promised to send a man out there as soon as possible. This was about five days before Prosper Meeker was hurt. Crecelius states he has had about eighteen year's experience in the electrial business; that when wires charged with electricity come in contact a short circuit is caused, producing a flashing, blowing out of fuses, the going out of lights, the flickering of lights and that the final effect of such contact, if continued, will be that the wires will become crystallized and burned until they come apart. The evidence of F. H. Worthington, general

foreman for defendant, is to the same effect. This is exactly what happened in this case. Upon the breaking of such wires, if a secondary wire, that is, one carrying a small voltage, should come in contact with a primary wire, that is, one carrying a large voltage (in this case 2,200 volts,) the secondary wire would take the primary voltage. It is amply proven in this record and is an admitted fact in this case that wires when coming in contact uninsulated and charged with electricity will burn and break in two (defendant's answer). The flames, flashes, sizzling noises and flickering lights are all indications of a meeting of such wires and are warnings of a dangerous condition which results in a severance of wires.

Defendant produced as a witness one Henry Burgeatz, who testified that on June 11, 1915, at 1:04 a. m., the Union Electric Light & Power Company received a call from Columbia and Clifton that a primary fuse was out and they sent a trouble man, John Schneider, to find out the cause. On the same day at 6:16 a. m., it received a complaint in reference to condition of wires in this locality. On June 13th, at 7:27 p. m. they received a complaint from 6239 Magnolia Avenue. On each occassion a man was sent out to find the trouble. A trouble man is supposed to look for the trouble, and it is his duty to examine the wires in the immediate neighborhood to find out the cause of the trouble. This the defendant did not do, although the dangerous condition was making itself manifest for ten days or two weeks prior to the injury.

Mrs. Carrie Menkhaus, who lived at 6271 Magnolia Avenue, was in the basement of her home about a quarter of four o'clock on the afternoon of June 15, 1915. While there she heard a popping noise which sounded so distinctly that she came out of the basement to see the cause of it. As she came up, she saw the wire in question break and fall apart, one piece falling over the tree heretofore mentioned, and extending down through the branches to the alley.

Mrs. Charles Murphy, of 6267 Magnolia Avenue, was in her kitchen and she heard a cracking sound and she, too, came out to see the cause. She saw the wires break; two fell towards the west down into the alley; and the other two along the pole into the alley. The day was pleasant and the sun was shining. It had rained on the Sunday previous, but had not rained thereafter. The wires broke and fell about ten minutes before plaintiff was injured.

Prosper H. Meeker was fourteen years of age on the 24th day of September, 1914, and on the day on which he sustained the injuries herein complained of, viz., June 15, 1915, he had been at school. He was acquainted with the alley, and formerly lived at 6273 Magnolia Avenue, in the rear of which the alley runs. After he reached home he started to go to Clifton Heights Park in company with Dedrich Schumacher, a boy seventeen years of age. They entered the alley at the west end and started to run down it at top speed. This is the testimony of the injured boy, Dedrich Schumacher and Bertha Stevenson. Prosper Meeker was a little ahead of Dedrich as they ran. The latter noticed the wire hanging down through the trees and shouted, "Look out for the wire!" Prosper did not hear this admonition. Immediately he either ran into or fell against the wire, there was a flash of electricity, the wires wriggled around Prosper's body, his clothing burst into flames and he fell prone to the earth, blood pouring from his mouth. Dedrich tried to take the wire from him and was knocked down, receiving a severe shock. He ran to Meyer's saloon, called for help, called Dr. Kirkpatrick, and returned to the scene of the accident. Prosper had been in contact with the wire two or three minutes before Dedrich ran to the saloon. Floyd Benson and Charles Campbell ran from Meyer's Saloon and extricated the injured boy. Benson had to look for a place on the wire where it was insulated and at the time was wearing rubber soles and heels, hence he escaped injury. When these men came to Prosper's

relief he was lying on his face, with the wires crumpled
up underneath his body. Blood was running out of his
nose and mouth and his shirt was in flames. His clothes
were burning, and as the wires were removed from
contact flesh came with the smouldering clothing;
there was an arc of electricity.

Dr. Kirkpatrick found the injured boy in a vacant
lot near the scene of the injury, where he had been borne
by his rescuers. Blood was oozing from his nose and
mouth and his body showed severe burns. An examina-
tion by Dr. Upshaw at the hopital diclosed ''an extensive
burn, including the entire arm, upper part of the left
arm and inner surface down to the wrist, and the middle
finger. Extensive burns extended irregularly over the
chest, down over the abdomen, around over the abdomen
and back, up irregularly over the back close to the spine,
back up to the shoulder. The surface was entirely burnt
off down into the muscle. He was also suffering from a
severe burn to the right hand, completely baring the
bones of all four fingers and the first phalanx of
thumb; also the entire palm surface of the hand;
the side up into the wrist was all burnt out. He also
had a burn on each thigh, anteriorly, at the time that
I examined him.'' All four of the fingers and the
first joint of the thumb on the right hand were re-
moved. He suffered severe pain and it was four
days before he became rational. The left arm is fastened
to the body for three-fourths of the distance of the
upper arm. The muscles of the upper arm are com-
pletely destroyed. His back and side are in a con-
tracted condition, scarred, and at the time the case was
tried, had not entirely healed. He has no use of the
left arm and hand. There is no movement scarcely
of the elbow and no operation will remedy the condition.
The right arm is normal, but the hand and fingers are
entirely destroyed. The wrist motion is badly impaired.
The palm of the right hand is scarred tissue. The left
breast is completely destroyed. The chest cavity is
narrow, due to contraction, and this is the case with

the abdominal cavity. The treatment extended for over a period of four months. During the treatment something like 234 skins grafts were made at different intervals. He suffered great pain and is permanently impaired from performing any work with his hands in any occupation he may take up. His nervous organism is impaired and there will remain considerable pain caused by the pinching of the nerves. Dr. Henry, a practitioner of twenty-five years' experience, testified that "the injured boy had the most extensive burn I have ever had the opportunity of observing and recover."

The different doctors who attended plaintiff have described his injuries as follows:

Dr. Robert Y. Henry testified: "I am a practicing physician and surgeon, having graduated from the Homeopathic Medical College of Missouri, then afterwards the Polyclinic, Chicago, and have been practicing since 1890. I have had a good deal of experience. I know the plaintiff and treated him for injuries. I saw him first in consultation with Dr. Upshaw, who had charge of his case in St. Anthony's Hospital in June, 1915, shortly after he was injured. He had the most extensive burn I have ever had an opportunity of observing, and recover. When I first saw him I did not think it was possible for him to recover from the injury. I found his right forearm and hand so badly burned it required the amputation of some of his fingers, and a burn extending over the left side of his body, including his arm and back and side and shoulder. The burn extended nearly to the hip, around past the median line front, and extending back nearly to the middle of the back. This arm had a third degree burn; that is, the skin was entirely burned from it, including some of the muscular tissues. We afterwards did repeated skin grafts. I don't remember exactly, something like 140 grafts were made at different intervals, and suceeded ultimately in getting the raw surface covered with skin, but he has a permanent—what we call a burn contracture on the left side of the body; that is, the

arm is bound to the body from the shoulder practically to the elbow, and I want to say that that condition cannot be remedied, even though the arm would have been dressed in this position (illustrating) and were in the position during the entire term this repair was going on.

"Burn contracture will draw down; it will fasten it to the body; and that is what is taking place in this case, and it will be permanent, and no operation will ever be able to correct it. If we had kept the arm in an extended position in this manner (illustrating) while the skin was healing over the burned surfaces, just as soon as you would have to remove the extension of the limb, the contracture would have taken place; it will draw right down to the body. We have that experience in burned hands. He will have some use of the forearm; he will have absolutely no use of that arm from the shoulder to elbow. It is as completely bound to the body as it can be and will always remain so, but he does have some use with the forearm and hand. The use of the fingers is impaired to a certain extent, but he will have some use of his hand. He cannot raise his hand to his face for the reason he has no use of the arm. He does have some use of the forearm. He was severely burned and is burned all over his chest, and these constrictures will restrict and impair the function of the left lung, for the reason that there is no expansion on that side of the chest, and there is a lot of inflammatory exudates which prevents the complete functioning of his left lung. His right forearm and right hand were so badly burned it required an amputation of the fingers. We tried to save them, but had to amputate them. A little of the thumb was saved, but not enough to be of any functional benefit. He had a burn in under the surface of his right arm, forearm chiefly. The burns are permanent and he has lost the permanent use of the forearm of his right hand.

"The last examination I made of the boy was probably six weeks or two months ago. When I first saw

him, all over the burned surface which I have mentioned, the skin and part of the flesh was entirely burned away, leaving a perfectly raw, seared surface; the muscles were exposed, the facias were entirely exposed over this burned area; a conplete third degree burn in every part. By a third degree burn is meant a burn into the muscular tissue. At this time there is a scarred tissue all over this region that was burned white; it is plainly visible all over this burned area. The right hand has a scarred appearance. It is slick and reddish in appearance and ulimately will become more white in appearance. The condition I have described could have been brought about by a burn from electricity. The injuries are permanent.

"He is permanently impaired from performing any work with his hands of any consequence, in any occupation that he may take up. As to the effect upon his physical and general health, I think it will be the means of shortening his life, and he certainly will not have the resistance a normal man will have; he will be a weaker man in every respect. While I was treating him I only saw him probably seven or eight times in consultation, and during the various skin grafting operations. He was unconscious part of the time and did not know what he was talking about. At all times he was highly nervous in suffering intense pain, and the repeated dressings which the wound required kept him highly nervous during the entire time. The nervous system is made up of nerve cells which may be shocked in many ways, that is, either from fright or from pain or from actual injuries, and in this case no doubt all of these elements had something to do with shocking the nervous system. I think in many ways he will have a permanent impairment of the stability of his nervous organism by having so severe an injury and shock as he received at this time. From the scarred tissue and contractures there will be impingement or pinching of the nerves which will cause him considerable pain, because there is not the freedom of motion or movement of any of the tendons or nerves as there would be in a perfect physio-

logical condition, and this will be permanent. He had intense pain from the shock and burns while he had raw surfaces.

"I think any burn from any cause is painful. I do not know that an electrical burn is more painful than burns from fire, friction or what it may be. A burn is painful at all times and continues over a great period of time, unless there is a complete destruction of the nerves supplying the parts; then it would not be so painful. He has extensive scars over the regions I mentioned and they will be permanent and distinctly visible."

Dr. Henry E. Kirkpatrick testified: "I found Prosper Meeker lying on a vacant lot about twenty yards from the alley in the rear of 6200 Magnolia Avenue. He was right there on the ground with his shirt practically burned off him and blood oozing from his nose and mouth. He was bleeding, and I ran back half a block for my automobile and took him home. His residence was about two blocks and a half from the place of injury. Meeker was put on a bed, and I stripped him of all clothes remaining on him and examined his injuries and dressed them.

"These injuries were severe burns over the left shoulder and arm, the whole left side of the chest and the entire armpit, and the burn was of dense, brawny, hard nature, which caused me to fear a third-degree burn. His right hand, especially the third finger of the right hand, at that time showed the burnt bone sticking through the flesh. The other fingers of the right hand and thumb were injured, but at that time it was impossible to determine the extent of the injury. I treated him that day, and in the evening I was called back again.

"A few days later I saw him at St. Anthony's Hospital at the invitation of Dr. Upshaw, and about six weeks later, after he was brought home. I saw him at the home in a bathtub where Dr. Upshaw was dressing him. At St. Anthony's Hospital I was given an opportunity to see his injuries, but more especially I saw the

condition of the boy. He was running temperature, and there were symptoms of sepsis or blood poison. His temperature was 103 or 104. It is impossible to handle an extensive burn of the kind without some degree of infection. At that time the operation had not been performed on his right hand. The skin at that time showed some suppuration at the edges, where it was beginning to slough, and there was pus material oozing from the wounds that necessitate constant dressing and redressing. The fingers of the right hand were blackened at that time, showing they were no longer giving their circulations, so that they were practically dead. He was delirious from the absorption. He was very sick, and my opinion at that time was that he would not live.

"It is always painful to dress burns as extensive as these burns were. The last time I saw him at his home, about six weeks after the injury, the right wrist looked at that time as though it was going to be necessary to amputate the right hand about the wrist. The fingers at that time had been amputated, at least some of them had. The burn at the left arm and shoulder and armpit showed at that time the extensive sloughing that had taken place, showing the muscles beneath. His temperature had gone to normal and he was resisting the blood poison. He was very sensitive to pain, and as to his nervous system, I could not say much, except that he was very sensitive to pain. He was at the time suffering from pain and it was severe. At least it would be painful during and after the dressing; how long after I don't know. The injuries described are permanent, and I think the effect that they will have on his general health will be to shorten his days and to retard his growth."

Dr. H. A. Upshaw testified: "I was called in consultation in the case of Prosper Meeker by my brother on the day of the injury, June 15, 1915. I examined the plaintiff, having met the case at St. Anthony's Hospital, and found the boy suffering with an extensive

38—279 Mo.

burn, including the entire arm, upper part of the left arm and inner surface down the wrist, and the middle finger. Extensive burns extended irregularly over the chest, down the abdomen, around over the abdomen and back, irregularly over the back close to the spine, back up to the shoulder. The surface was entirely burned off down into the muscle. He was also suffering a severe burn to the right hand, completely baring the bones of all four fingers and the first phalanx of the thumb; also the entire palm surface of the hand; the side up intc the wrist was all burned out. He also had a burn on each thigh, anteriorly, at the time when I examined him. We immediately applied treatment to allay the irritation and also to prevent toxemia, the absorption of toxine, and to assist the kidneys in elimination, on account of the loss of the fissures of the skin, the glands of elimination, and we watched him closely for several days before we could do anything surgically. He was not unconscious, but seemed in a dazed condition. The pulse got high as 160, and his temperature ran up, and he became in a very critical condition for several days. For five or six days the first week we hardly thought he would live. We had to remove all four of the fingers and the first joint of the thumb on his right hand. We continued the moist-pack treatment until we got rid of the burnt tissue; then we applied skin graft. The treatment continued over a period of about four months. His health during this time was very bad. He suffered with uremia a great deal, and also albuminaturia, due to the loss of secretion of the glands and skin. The urine was constantly full of albumen, which we had to combat continuously. The effect on his nervous system will be permanent. The termination of all these nerves had been destroyed, and that is bound to cause an effect upon the nervous system. He suffered very severe pain and was semiconscious and unconscious for about four days before he became really rational. The left arm is fastened to the side for about three-fourths of the distance of the upper arm. The muscles of the upper arm

are completely destroyed. The arm has grown tight to the body, due to contracting of the scarred tissue, and everything was done that could be done to prevent it. His back and side are now in a contracted condition, scarred—contraction of the scarred tissue—and it is not entirely healed and will not be for some time. Practically, as far as labor is concerned, he has no use now of the left arm and hand. There is no movement scarcely at all of the elbow, just as of the wrist and arm, and no operation will remedy the condition, because, when you separate the scarred tissue, it will immediately draw back again. You cannot prevent it. It has been tried again and again. The right arm is normal, but the hand, fingers, are entirely destroyed. The thumb motion is very good, but the wrist motion is badly impaired. The palm of the right hand is just contracted scarred tissue. It was all destroyed, all sloughed out. The left breast on the left side of the chest is completely destroyed. The chest cavity is narrow, due to contraction. The abdominal cavity is also narrow, due to contraction. It has the effect of narrowing the chest, and that causes a pressure on the lung and does not allow the lung to respond in respiratory action as it should, and throws more work on the right lung. The condition in which I found this boy could have been produced by a burn from electricity. The effect of all these injuries will be an impairment to his general health, due to the narrowing of the cavity lung, which interferes with peristalsis of the bowels, and will impair the nerves, and this condition is permanent. The conditions I saw in this boy, will, without question, shorten his life and he will suffer some pain continually on account of these contractions. The pain was intense each time the dressings were changed, and they had to be changed often on account of the sloughing of the tissues. All the sloughed tissues would hang on.''

Dr. Ira W. Upshaw testified: ''Prosper Meeker's case was my case, and I first saw him about six o'clock on the day of the injury at his home. He was taken to

the hospital as soon as I could get an ambulance. I examined him, and found the right hand, the palm of it, practically destroyed; the burn ran over the back of it. The fingers, the flesh was burnt off and exposed the bones. About half the bone of the thumb was exposed. The left side burn extended down over the chest to about the lower edge of the ribs or just below, even to the abdominal cavity, and down the back about the same distance. The forearm was almost entirely destroyed; the flesh not entirely, but it was very badly burnt down the elbow. Below the elbow burns were not very severe. On each thigh he had a burn on the anterior part of the thigh. The majority of these burns were third-degree burns, and that means complete destruction of the tissue. To relieve the shock as much as possible and to allay the pain, he was given elimination treatment, the usual treatment in cases of burns. Following his admission to the hospital he was semiconscious. Toxemia was somewhat developed, that is, the absorption of poison through the destruction of the skin; and we combated that with serums and the treatment usually used in those cases. The boy became very seriously ill, his pulse got very high, his temperature high, and after six or eight days we thought he would not live. Following that there were times when we thought he was improving; times when we thought he was not. After a time the tissue came off, the majority of it, and after we got rid of the burnt tissue the boy got in a better condition, for the skin grafted and improved materially. It was necessary to take off all the fingers and the thumb at the first joint of his right hand. On account of the contraction of the scarred tissue his left arm is adherent to his side. He has good motion of the wrist and hand and a slight motion of the elbow, but not above. About three-fourths of the arm from the shoulder to the elbow is now grown and bound down to his left side, and the motion there is destroyed. I think he can bring it up to his chin by bringing his head down to it. These injuries were a very severe shock to his

nervous system and it is permanent. These other injuries are permanent. On account of the contraction of the tissues he will have considerable trouble, and his trouble will increase. On account of the contraction there is pressure on the lung, causing more or less solidification of the upper part of the lung, and the lung will not grow any larger. We grafted skin on at least three-fourths of the tissue that was burnt on his body.''

Dr. H. A. Cleveland testified: ''I am acquainted · with nervous disorders and injuries to the nerves, not as a specialist, but in a general way. I know Prosper Meeker and examined him about the middle of June at the request of Doctor Upshaw, as consultant. I found him in a condition of profound shock, shock being injury to the nervous and vascular system that may result. from physical or psychical strain. It creates a permanent instability of the nervous system. On examination I found his right hand practically destroyed, the fingers and part of the thumb. A very extensive burn at the left side, in front, the chest, the abdomen and back, and the entire left arm, down to the wrist, part of the hand and fingers on the left side. They were third-degree burns. I saw him frequently after that. His condition during the first or second week became progressively worse; his condition was very serious. He went into a coma, not continuous, and was delirious at times. Then he began to improve to the extent that the wounds began to heal. The edges of this burn began to heal exceedingly slowly, and after several weeks the condition of the urine appeared, it having been exceedingly toxic and containing much albumen. This was on account of the overworking of the kidneys. Several operations were performed for skin grafting. The earlier operations were the removal of his fingers and dead tissue, as it seemed somewhat loosened. He was not put under an anesthetic for every operation and they were exceedingly painful. His condition today is one of permanent disability, resulting directly from the burn. By that I mean that he is practically unable to

use his left hand at all. The arm is fastened to the side of his body, and he is going to have a marked restriction of normal respiration because of the contraction of the left side, and he is going to have more or less symptoms from his gastro-intestinal tract, due to contraction and pulling of the abdominal wall. He is going to have a permanent injury to his nervous system, as readily can be seen by his face to-day. That is the direct result of the shock received at the time. I have not examined this boy since about the first of October. At that time the contraction was excessive. The left arm down to the elbow was fastened directly to the body. There was no muscular tissue in the upper part of the arm practically at all, and then there were the excessive scar tissues through the forearm and on the left hand. On his right hand I remember three or four of these fingers were practically gone, and a part of his thumb. The scars are burned white, more or less bloodless along the edge, as no blood vessels were working there. They had a pink or over-red color. The effect of these injuries and this shock and the treatment will shorten his life. He suffered excessive pain up to about the first of September from the time of the injury. In the treatment he was required to sit in a chair night and day. I cannot remember accurately the number of skin grafts, but something over two hundred about two hundred and thirty-four.''

Plaintiff's instruction numbered 1, on which the case was submitted to the jury, was as follows:

''1. If the jury believe from the evidence that on the 15th day of June, 1915, the defendant company owned and was then and there and for a long time prior thereto had been using the wires mentioned in the evidence in the conduct of its business, and that defendant was at all said times engaged in the business of furnishing and selling electricity in the City of St. Louis, and that its said wires were strung to poles, and that said poles and wires at the place mentioned in the evidence where plaintiff was injured, if you so find, were on, in, along and

over a public alley and highway in said city, and that said wires, in the conduct of defendant's business were then and there charged with and carrying currents of electricity;

"And if the jury further believe from the evidence that at a point in said alley in the rear of residence No. 6273 Magnolia Avenue, in said city, the defendant negli- gently permitted one of its said wires then and there charged with electricity to become uninsulated and to come in contact with another wire or wires or some other object and to chafe and rub against said wire or wires or some other object, and to become broken in two, and to fall to the surface of said alley;

"And if the jury further believe from the evidence that on the 15th day of June, 1915, by reason of said wire then and there being uninsulated and coming in contact with, and rubbing and chafing against another wire or wires, or some other object, if you so find, said wire was, while so charged with electricity, if you so find, negligently permitted by defendant to become broken in two at said point in said alley, and then and there fall to the surface of said alley at said place, while charged with electricity, and that plaintiff while travel- ing on said alley, came in contact with said wire, and that an electric current from said wire was then and there communicated to plaintiff and he was thereby shocked, burned and injured;

"And if the jury further believe from the evidence that defendant knew, or by the exercise of the utmost care of an ordinarily careful and prudent person en- gaged in the same or similar business, under like or similar circumstances, could have known that said wire was so uninsulated, and was so coming in contact with and rubbing and chafing against another wire or wires or some other object, and was on account thereof liable to break in two and fall to the surface of said alley, a sufficient length of time before the plaintiff was injured, if you find he was injured, for the defendant, in the exer- cise of the utmost care of an ordinarily careful and pru-

dent person engaged in the same or similar business un-
der like or similar circumstances, to have remedied the
same, and averted the injury to plaintiff, and negligently'
failed to do so, and that by reason thereof the plaintiff
was injured, and that plaintiff himself was not guilty of
any negligence which directly contributed to cause his
injuries, if any, then you must find for the plaintiff."

I.   Counsel for defendant first complain of the ac-
tion of the court in refusing to give its demurrer to the
plaintiff's evidence.   The ground of this complaint is
that the petition contains but a single charge of negli-
gence, namely, in permitting its wires to be-
come separated and suspended in the alley

**Demurrer.**

where the plaintiff was injured, when the uncontradicted
evidence shows that the injury occurred within ten min-
utes after they were parted and fell, which was too short
a time in which the defendant could possibly have re-
joined the same or otherwise avoided the injury.

The plaintiff's answer to this complaint is that the
petition does not consist of a single charge of negli-
gence as previously stated, but contains three separate
and distinct allegations of negligence, namely:   (1) That
the defendant negligently permitted the wires to be-
come uninsulated, (2) to break in two and (3) to fall to
the ground.

In our opinion the contention of counsel for plain-
tiff is the correct construction of the petition.   It clearly
charges the defendant with negligently permitting the
wire to become uninsulated, to break in two and to fall to
the surface of the alley.   The three allegations are con-
nected with the copulative conjunction "and," which
word connects the two last charges with the first, which
in plain English means that the defendant not only neg-
ligently permitted the wire to become uninsulated, but
negligently to break in two, and negligently to fall upon
the surface of the alley.

The law is well settled in this State that the plain-
tiff did not have to prove all three of those charges. Any

one or more of them, if proven, were sufficient to make out the plaintiff's case.  If the defendant **Proximate Cause.** negligently permitted the wire to become uninsulated, and come in contact with the branches of a tree or another wire for such a length of time as to have enabled it to have discovered the defects, in time to have prevented the injury, but did not do so, and on that account the plaintiff was injured, then the defendant is liable, even though the wire was not down for more than a moment.

The evidence not only showed that the defendant had ample time in which to have discovered the defects mentioned and to have remedied the same in time to have prevented the injury, but it also showed that it was repeatedly notified of those defects ten or fifteen days before the injury occurred, and that it neglected to remedy the same during all that time, which was clearly negligence of the grossest kind.

Under those conditions the length of time the wire was down was wholly immaterial, for the negligence consisted in permitting the wire to part and fall upon the surface of the alley; that was the continuing and the proximate cause of the injury, just as much so as if the wire had fallen upon the plaintiff, instead of upon the ground and he had run into it while it was in that position.

The foregoing ruling is well supported by the following cases: Hoover v. Railway Companies, 159 Mo. App. 416, l. c. 421; Heberling v. Warrensburg, 204 Mo. 604, l. c. 618.  This point is ruled against the defendant.

II.  Counsel for defendant next insist that the court erred in giving instruction numbered 1 for the plaintiff. The ground of this insistence is that the instruction broadened the issues made by the pleadings, it being their contention that the petition, as previous- **Broadening Issues.** ly contended, charged only a single act of negligence, while the instruction submitted the three charges before mentioned.

There is no merit in this insistence for the reasons stated in paragraph one of this opinion in connection with ruling of the court in refusing the defendant's de-- murrer to the evidence. While the plaintiff had the right to prove and submit to the jury all the charges of negligence contained in the petition, yet he was not required to· so do, the proof of any one or more of them being all the law required, and the finding of the jury upon such in his favor justified a verdict in his behalf. [Van Horn v. Transit Co., 198 Mo. 481; Newlin v. Railroad, 222 Mo. 375, l. c. 393; Gannon v. Gas Light Co., 145 Mo. 511; Moyer v. Railroad, 198 S. W. 839, 1. c. 842; Spaulding v. Met. St. Ry. Co., 129 Mo. App. 607; Dutro v. Met. St. Ry. Co., 111 Mo. App. 258, l. c. 264; Hoffman v. Walsh, 117 Mo. App. 278; McMurry v. Prairie Oil and Gas Co., 159 Mo. App. 623; Yost v. Atlas Portland Cement Co., 191 Mo. App. 422, 1. c. 434; Mullery v. Tel. Co., 191 Mo. App. 118, 1. c. 126, 127.]

III.    Counsel requested the court to give the follow- ing instruction to the jury, which the court refused, and the defendant duly excepted:

"The court instructs the jury that if they shall find and believe, from the evidence, that the wires in ques- tion fell so short a time before the plaintiff was injured that the interval of time was not reasonably long or sufficient in which to have enabled defendant to remedy or remove the danger, then the plaintiff cannot recover and it will be the duty of the jury to return their verdict in this case in favor of. the defendant."

*Instruction.*

This instruction was practically a demurrer to the evidence and if it was error to refuse it, it was for the same reason error to refuse the demurrer. I say this for the reason that the undisputed evidence was that a sufficient time did not elapse between the falling of the wire and the happening of the injury to have per- mitted the defendant to have repaired the defect, and thereby have avoided the injury. Under the facts of

this case, as previously stated, the length of time the wire was down is wholly immaterial.

The action of the court in refusing this instruction was proper.

IV. It is next insisted by counsel for defendant that: "The court erred in permitting the witness Meyer to testify to an alleged telephone conversation supposed to have been had with a represen-
Telephone
Communication. tative of the company, although the witness admitted that he did not know whom he was talking to," and cites in support thereof, the case of Strack v. Telephone Co., 216 Mo. l. c. 614.

While the language of that case seems to lend support to the defendant's contention, yet the facts are so meagerly and imperfectly stated that it is difficult to determine what was the real point held in judgment, and for that reason that case has but little weight in the determination of the question here involved.

Here the evidence shows that the defendant had a telephone in its office with a given number which was published in the telephone book, and that the witnesses in this case picked up that book and called that number, and in response thereto someone answered and said, "This is the Union Electric Light & Power Company," and thereupon the complaints heretofore set out in the statement of the facts were related to that person, who replied in substance to each and all of the witnesses, "All right; we will send some one out and have it repaired."

This court, in the case of Wolfe v. Missouri Pacific Ry. Co., 97 Mo. 473, passed squarely upon this question and held this character of testimony admissible, and in discussing the question, BARCLAY, J., speaking for the entire court, on page 481, used this language: "A question arose incidentally at the trial upon the admission in evidence of a conversation held through the telephone between some one at the instrument in plaintiffs' private office and the witness. It was admitted,

though the witness did not identify the voice of the speaker as that of either of the plaintiffs or their clerk. The courts of justice do not ignore the great improvement in the means of intercommunication which the telephone has made. Its nature, operation and ordinary uses are facts of general scientific knowledge, of which the courts will take judicial notice as part of public contemporary history. When a person places himself in connection with the telephone system through an instrument in his office, he thereby invites communication, in relation to his business, through that channel. Conversations so held are as admissible in evidence as personal interviews by a customer with an unknown clerk in charge of an ordinary shop would be in relation to the business there carried on. The fact that the voice at the telephone was not identified does not render the conversation inadmissible. The ruling here announced is intended to determine merely the admissibility of such conversations in such circumstances, but not the effect of such evidence after its admission. It may be entitled, in each instance, to much or little weight in the estimation of the triers of fact, according to their views of its credibility, and of the other testimony in support, or in contradiction of it.''

The same rule is announced in the following cases: Globe Printing Co. v. Stahl, 23 Mo. App. 451; Publishing Co. v. Warehouse Co., 123 Mo. App. l. c. 18; Reed v. Railroad, 72 Iowa, 166.

The latter case well considers the question, and it holds that although the witness did not recognize the voice of the person to whom he was talking at the other end of the line, the conversation had between them was nevertheless admissible, just as much so as if the witness had gone personally to the defendant's ''trouble department'' and had talked to this same person in charge of it, whose name he did not know.

We most heartily approve that doctrine; this court cannot shut its eyes to the fact that the telephone systems of this country extend all over it, penetrating

almost every business house and residence throughout the length and breadth of the land, and that a very large percentage of the gross business of the country is transacted over the telephone; and in view of these facts, to hold that conversations had over them regarding business transactions are inadmissible in evidence, would virtually destroy their usefulness, for the simple reason that but few who talk over the telephone are personally acquainted with the telephone boy or girl to whom he talks, nor can they recognize their voices. And, as was well held in case of Wolfe v. Railway Co., supra, when one places himself in connection with a telephone system through an instrument placed in his office with a given number thereto, he thereby invites communications with him regarding business through that channel, and that such communications are inadmissible in evidence upon the theory that the person who has charge of that telephone in his office is, presumably, his agent or servant for the purpose of receiving those communications.

The court properly overruled the defendant's objections to that evidence, and its ruling in admitting the same was correct.

VI.   The final and last error complained of by counsel for defendant is that the amount of the verdict is excessive.   The jury returned a verdict for $50,000, but the court required the plaintiff to remit $15,000 and then rendered judgment for the plaintiff for $35,000.   During the argument of this case the writer was impressed with the idea that the verdict was excessive, but since carefully reading the evidence of the entire record regarding the plaintiff's horrible injuries, their character, extent and permanency, I have changed my opinion in that regard, and I am inclined to concur with the learned trial judge who heard this evidence and saw the plaintiff and observed the character and extent of his injuries, which placed him in a far better position to

*Excessive Verdict.*

observe and judge what would be a reasonable sum to compensate the plaintiff for his injuries than this court is in.

Finding no error in the record, the judgment is affirmed. All concur except *Blair* and *Graves, JJ.*, who dissent as to amount of judgment.