# BERTHA D. HOLLIS, Respondent, v. KANSAS CITY LIGHT AND POWER CO., Appellant.

### Kansas City Court of Appeals, June 26, 1920.

1. **NEGLIGENCE: Electricity: Proper Insulation.** It is the duty of one transporting the dangerous instrumentality of electricity to keep its wires in such condition and so insulated as to prevent the escape thereof wherever it can be reasonably anticipated that persons might lawfully come near thereto; and the failure to keep a wire stretching on a pole at a distance of twenty feet in the air properly insulated is negligence.

2. **MASTER AND SERVANT: Electricity: Duty Owed.** A master owes to a servant who is required to work in close proximity to electricity, and who is not skilled in the knowledge of electric wires, the duty of keeping the wires properly insulated.

3. **NEGLIGENCE: Defective Insulation of Wire: Proximate Cause.** Where it may be reasonably anticipated by the defendant that an electric wire will be broken and caused to be thrown to the ground, the negligence of the defendant in failing to have the wire properly insulated is the proximate cause of the death of one killed while picking up wire from the ground.

4. ———: ———: ———: **Contributory Negligence.** Where the intervening act is an act of negligence on the part of the plaintiff there can be no recovery.

5. **MASTER AND SERVANT: Scope of Employment.** Where the deceased, in addition to being engineer of a coal shovel, was foreman of the coal yard of which he had charge at the time, picked up a wire which had been broken and had fallen to the ground when he had attempted to move the steam shovel it cannot be said as a matter law that he was not acting within the scope of his employment in picking up the wire, when the wire was in the way of the work.

6. **CONTRIBUTORY NEGLIGENCE: Jury Question.** Whether or not the deceased in picking up the wire was guilty of contributory negligence, under the evidence was a jury question.

7. **NEGLIGENCE: Issues: Instructions.** An instruction which permits a recovery by plaintiff without regard to contributory negligence is erroneous. Instructions should submit the case in terms so that the jury may understand just what the particular issues are which, if found in plaintiff's favor, will establish liability.

8. **PRESUMPTIONS:** Instructions. Where there is evidence as to the facts surrounding the death an instruction which indirectly intimates that there is a presumption that deceased possessed the instinct of self-preservation, is improper.

Appeal from Jackson Circuit Court.—*Hon. Daniel E. Bird,* Judge.

REVERSED AND REMANDED.

*Gamble, Kennard & Trusty* for respondent.

*John H. Lucas* and *Wm. C. Lucas* for appellant.

TRIMBLE, J.—Plaintiff's action is for damages on account of the death of her husband who was killed on August 10, 1917, by one of defendant's wires charged with a heavy current of electricity. Judgment for $6000 was obtained and defendant has appealed.

Deceased was foreman over, and the engineer in charge of and operating a steam shovel in, defendant's coal yard situated on the south side of and immediately adjoining Guinotte Avenue in Kansas City, Missouri. Said Avenue runs east and west and double street car tracks are in the center thereof, the north one being the west bound and the south the east bound track. The avenue was sixty feet wide from property line to property line and the roadway thereof, thirty-six feet in width, was brick-paved and curbed, thus leaving south of the south curb a sidewalk space of twelve feet, but at the time and place in question no sidewalk had been constructed thereon. The east end of the coal yard was bounded by a north-and-south switch track of the C and A. Railroad; and a short distance west of and parallel to this railway track was an unconnected, independent track on which the steam shovel stood and was moved along thereon to various points necessary to reach the coal desired to be shoveled. As stated, this steam shovel track was not connected with any other track, but began at some point in the southern part of the coal yard and

went north (possibly 220 feet) to a point from three to six feet south of the curb line on Guinotte Avenue. The coal was piled on both sides of this short piece of shovel track, but the far greater rick was on the east side thereof and the pile of coal went north up to Guinotte Avenue and, as we gather from the record, extended over into and on the sidewalk space thereof. Defendant's coal coming in on the C. and A. railroad was dumped on the ground so as to form this rick east of the steam shovel; and the latter was used partly to load the coal into defendant's cars when they came into the yard on the "Y" hereinafter described, and partly to transfer it from the pile on the east of the shovel-track to the pile on the west side thereof. This steam shovel consisted of a flat car on which was mounted a turn-table having thereon an engine which, by steam power under the control of the engineer, operated a crane or "boom" forty-six feet long, from the end of which hung the shovel or "clam-shell" suspended by a cable running over a pulley. The power of the engine could be used either to move the flat car forward or backward on the shovel track, or in turning the crane around from front to back or from side to side on the turn-table, or in raising and lowering the crane in the filling and emptying of the clam-shell. On Guinotte Avenue were a number of electric and telephone wires; and at a point almost due north of the north end of the shovel track and about eight inches south of the south curb line on Guinotte Avenue (and therefore in the sidewalk space), were two and perhaps three poles, on one of which was a wire of defendant's carrying a current of 2300 volts of electricity. This wire was perhaps twenty feet from the ground, and after coming west to said pole continued on west a distance of about 122 feet, at the same height above the ground and just south of the curb line, to a pole located about the same distance south of the curb line as the other one. About twelve feet east of this pole was a dedicated alley the north end of which, at the south edge of the paved roadway of the Avenue, was marked by the curb turning south in round-

ed corners and proceeding south for a few feet, and into this mouth the paving extended south for a short distance. In this paved portion of the alley and about ten feet south of the mouth thereof was a manhole fitted with an iron lid. About twelve or thirteen feet east of the alley and close to the curb line stood another pole carrying some kind of a wire presumably a telephone wire. And on the northern street car track, at a point north of the alley, a switch track started in a curve to the southeast until it finally reached a point in the coal yard where it turned due south and went on to some unknown distance therein. The point where this curved switch cut the south curb line of Guinotte Avenue was a little over seventeen feet east of where the last mentioned pole stood. On the south street car track, at a point practically north of the north end of the shovel-track and of the first pole herein above mentioned, a similar switch started in a curve to the southwest joining the other curved switch in the coal yard at the point where they both went south, the two curved switches thus forming a "Y" by means of which a car on the south street car track could go east past the east switch, then back around to the southwest and south on the coal yard and be loaded with coal and then go forward to the north and west, on the west prong of the "Y," and get upon the west-bound track, thus leaving the coal yard in that manner. It was fifty-nine feet from the first pole hereinabove mentioned west to the west prong of the "Y."

The deceased had been a locomotive engineer, and since the previous March had operated defendant's *electric* crane or shovel, but the night before the tragedy a *steam* shovel had been moved out to the yard to be used in its place. This, however, does not appear to be a matter of great importance as a steam crane and an electric crane are "handled similarly," the former having perhaps a few more levers. Deceased, as engineer of said crane, had an assistant named Hunt and the two handled the steam shovel and did the work of shoveling the coal.

About 7 o'clock in the morning of August 10, 1917, deceased and his assistant, preparatory to begin shoveling coal, started to move the steam shovel north along its track in order to place it at the spot desired. It was slightly down grade to the north on the shovel track. The crane or boom, slanting upwards, was pointed north and, before starting to move the shovel, deceased did not turn the crane around to the south; and, in the course of the movement of the shovel north, the huge machine got beyond control, and the helper, seeing this, jumped off to get a railroad tie to "chock" or block it. Before he could find the tie and do this, the machine ran north along the track until the crane, sticking up northward into the air and in front of the machine, touched or ran into the wire hereinabove specifically described as running from the pole near the north end of the shovel track west of 122 feet to the pole west of the aforesaid alley-mouth. The contact of the steel boom with the wire formed a circuit and the wire burned in two. This occurred at a point about two feet west of the pole standing at the north end of the shovel track and the portion of the wire, running west to the west pole, fell across another wire and then slid off of same and fell to the ground. In this position it ran from the top of the pole west of the alley-mouth down to the ground in an easterly direction across the alley, over the manhole, past the pole standing twelve feet east of the alley, and then curved out in a northeasterly direction across the west prong of the aforesaid "Y" and then turned north and west and then back around to the southwest toward the last mentioned pole again, thus forming a sort of loop running across the sidewalk space and out into the paved roadway over the said west prong of the "Y" and back again.

When the crane broke the wires and this one fell, deceased backed the machine to the south and out of the wires and stopped, then got off the machine and walked over to a point close to the pole twelve feet east of the alley and there, facing north, stooped over and picked

up the wire with one hand; he straightened up, took hold of it with the other hand and when he did this, having the wire in both hands, exclaimed ''Oh'' and fell forwards on his face. Two men, walking east along the north side of Guinotte Avenue, saw the occurrence and ran over to him, calling for the assistant at the crane. A dry board was secured, and with it the deceased body was turned over and the wire pushed away from him and pulled through his hands. He was dead. The point where he picked up the wire was about a foot from the curb and about seventy-five feet distant from and west of the crane. He took hold of the wire a short distance from the end thereof.

Plaintiff's evidence as to the tragedy consists of the two men who were walking east at the time as above stated; and the first they saw of the entire occurrence was when deceased was walking west, about six feet from the curbing, toward the point where he picked up the wire and was electrocised. Plaintiff's evidence reveals nothing occurring prior to that time, nothing relative to the burning in two or breaking of the wire or of anything else until deceased started and was on his way to the fatal spot.

The attempted ''spotting'' or placing of the machine further north, its getting beyond deceased's control because the brakes failed to work in some way, the running of the boom into and breaking of the wires, all came from defendant's witness Hunt, deceased's assistant. It was, however, elicited on cross examination of one of plaintiff's witnesses that at the time of the tragedy the steam shovel was standing with its crane to the north, and as Hunt says deceased moved the shovel north along the track toward Guinotte Avenue and the wire, with the crane or boom pointing north, it must be taken as conceded that the crane was so pointing as the machine was being moved north.

According to defendant's evidence, deceased's orders were, whenever he had occasion to move the steam shovel toward the wires, to turn the crane *around to the rear*

and not to move it with the crane pointing in the direction he was moving. Plaintiff has some evidence tending perhaps to show that, owing to the north end of the pile of coal being so far north and so near to the wires and the traveled roadway of Guinotte Avenue, it would be impossible to shovel that coal without having the boom turned in that direction and under the wires, at least when the shoveling of that particular coal was being done. This, however, it seems to us, would not obviate or excuse the violation of the rule to have the boom *pointed to the rear* whenever the *machine itself* was to be moved.

As stated, the only evidence as to what occurred *before* plaintiff's witnesses saw deceased going on his fatal journey toward the wire, is obtained from defendant's testimony. According to Hunt, when deceased backed the shovel out of the wires and got off the machine, he (deceased) said to Hunt "If that is a telephone wire it will cost me $15." Hunt replied "Whatever kind of a wire it is, it is a live wire. The best thing you can do is to telephone into the plant and have them fix it up." The defendant's evidence shows that the company maintained a crew of men properly equipped, and expert in the matter of handling broken live wires, and that when a telephone call of that character came in they were prepared to go quickly to the place and repair the damage. There was a telephone on one of the posts near the north end of the shovel track and it was connected directly into the plant, and Hunt says when he saw deceased start walking away after the suggestion he made to him, he, Hunt, thought deceased was going to telephone. Hunt says that he and deceased were standing side by side about two feet apart when he told deceased it was a live wire and he had better telephone; but when asked if deceased heard him he replied, "I couldn't say as to that." It was shown in evidence that deceased was deaf in one ear. The telephone was there and in working order, for one

of plaintiff's witnesses says he used it to telephone for help after removing the wire from deceased's body.

According to Hunt's evidence, he did not see deceased go to the wire. He himself was looking north but finally looked toward deceased and saw him just as he was picking up the wire; that when he picked it up deceased straightened up *rigid,* and witness saw something was wrong; that deceased stood in this attitude for five or ten seconds and then fell over.

According to one of plaintiff's witnesses, after they got the wire away from deceased, the part lying across the manhole began to burn and burned in two; and before deceased fell over witness did not notice that an electric wire was there though he says he was not looking on the ground, and deceased, as he walked west, was looking up at the pole and the wires.

According to this same witness, the insulation on the wire was old, cracked, broken, and at these places the copper wire inside was exposed, and when the wire was pushed or pulled through deceased's hands all the insulation left came off and was sticking out his hands. According to another of plaintiff's witnesses the insulation was worn, old and broken in places; it was once a black insulation but had bleached out and now was brown and stringy; the wire was about the size of an ordinary telephone wire but had been insulated. In other words, there was evidence tending to show that the insulation was badly deteriorated, whereby it failed to furnish protection against one who would touch or pick up the wire.

The petition, after alleging that defendant operated an electric light and power system in Kansas City and transmitted electric current from place to place on overhead wires strung along the public highways of said city, charged that—

"On or about August 10, 1917, plaintiff's husband, Charles F. Hollis, without fault on his part, met his death upon said Guinotte avenue . . . by there coming in contact with one of said wires charged with

said electric current that defendant had negligently suffered to become defectively insulated and broken in two, and to fall to the surface of said street, and onto certain railway tracks extending from defendant's plant onto said street, which tracks were then being used by defendant for the work which her husband and other employees were then engaged for the defendant. At the times herein mentioned the plaintiff's husband was employed by the defendant at its plant adjoining said places to operate a coal-shoveling device and to load coal into cars and to render all such services as were necessary and incidental to the carrying on of said work, and at the time of his fatal injury, he was attempting to remove said wire from the places where it had fallen and was so lying, so as to continue said work.''

The answer contained first a general denial, next a plea of assumption of risk, and finally a plea of contributory negligence in that deceased was himself the cause of the wire being down, and, seeing and knowing that it was down and that it was charged and dangerous to take hold of, nevertheless took hold of it.

The question which should be disposed of first is whether, under all the facts, a case of liability on the part of the defendant for the death was made for the jury. In passing upon this question, it must be borne in mind that the defendant was transporting along the public streets a very dangerous agency, exceedingly dangerous and deadly if it escaped control or left the path in which it was intended to go. Furthermore, it is manifest that there was evidence, as to the condition of the insulation on the wire, tending to show that it was old, worn, broken, and defective. Insulation is to prevent the escape of electricity when the wire is touched; and to afford protection against its deadly force, it must be in good condition. The evidence is that the cables conveying the current which operated the electric crane were insulated and lay on the ground, and that deceased's assistant pulled them back and forth

204 M. A.—20

out of the way whenever it was desired to move the machine. Under the law, it was the defendant's duty to take "every precaution" and use the "utmost care" to keep its wires in such condition and so insulated as to prevent the escape of its deadly agency, at least wherever it could reasonably be anticipated that persons might lawfully come near thereto or where such wires might be liable, through something reasonably to be anticipated as likely to occur, to get where contact could be had therewith. [Gannon v. Laclede Gas Light Co., 145 Mo. 502, 512; Geismann v. Missouri Electric Co., 173 Mo. 654, 678; Ryan v. St. Louis Transit Co., 190 Mo. 621, 633; Hill v. Union, etc., Power Co., 260 Mo. 43, 77; Booker v. Southwest Missouri R. Co., 144 Mo. App. 273, 288; Wilhite v. City of Huntsville, 167 Mo. App. 155; Ratliff v. Mexico Power Co., 203 S. W. 233.] In Von Treba v. Laclede Gas Light Co., 209 Mo. 648, 659, and in the Geismann case, supra, it is held that any escape of current from a wire shows defective insulation and that defective insulation in turns shows a failure of the defendant to exercise the care required of it. Consequently, in the case at bar, there can be no doubt there was ample evidence to show that defendant failed to keep the insulation on the wire in question in a safe and proper condition. But this wire was on a pole twenty feet in the air, and hence was it defendant's duty to see that proper insulation was maintained? Undoubtedly it was, since this wire was not only close to other wires and poles (telephone and the like) where workmen would likely ascend the work, but it was along the highway where, if the wire did break and fall, it would be in the way of the travelling public. The defendant could reasonably anticipate that the wire might fall, either through a storm or even in the way it was caused to fall, namely, by the steam shovel touching it in shoveling coal thrown in such close proximity thereto. So that the jury could well say the defendant was negligent in not maintaining proper insulation on said wire. [Goebel v. Union, etc.,

Power Co., 188 S. W. 1135; Jeffrey v. Union, etc., Power Co., 171 Mo. App. 29.] And allowing the insulation on the wire to get into such condition would be negligence without regard to whether the company had notice of the break and fall of the wire or not. [Meeker v. Union, etc., Power Co., 216 S. W. 923, 931; Wilhite v. Huntsville, 167 Mo. App. 155, 160; Southwestern, etc., v. Telephone Co., 155 S. W. 668, 665.]

But, in this case, the fall of the wire was caused by the *deceased himself* in the operation of the steam shovel; the deceased was killed at a point seventy-five feet away from his steam shovel, and in attempting to remove the wire from where it was after he had, according to the defendant's evidence, been warned that it was a live wire and that he should telephone to the defendant and have it removed by the crew maintained for that purpose. So the questions arise: First: Does the negligence and liability of the company, under the principles enunciated by the foregoing cases, extend to and protect a *servant* of defendant, and especially one who caused the breaking and fall of the wire? Second: Was the deceased within the scope of his employment or performing any duty he owed his master at the time he was killed? Third: Was he guilty of contributory negligence in attempting to pick up the wire himself instead of telephoning to the plant?

Taking the first question hereinabove propounded, we may observe that plaintiff's cause of action is de rived through the husband and hence is governed by the legal principles covering the liability of a master for an injury to his servant. And, it is true, the *basis of liability* of an employer to an injured employee is *negligence* on the part of the former, which negligence must be the *proximate cause* of the injury, and the *duty neglected* by the employer must be one *owed to the employee.* [18 R. C. L. 544 and 546.] And *reasonable care* is the diligence which the employer owes to the employee for his protection; but this is a *relative* term, and what is "reasonable care" depends upon the surrounding facts

and circumstances, for what would be reasonable care in one situation would be gross negligence in another; and, usually, what is reasonable care in a particular set of circumstances is a question for the jury to determine. [18 R. C. L. 546, 547.] Now, the injured servant in this case was not an electrician, he had been a railroad locomotive engineer and his work for defendant consisted of being *foreman* of the coal yard and engineer of the coal shovel. It is not shown that he was skilled in the knowledge of electric wires and what they were likely to to, or how they should be handled. And he was required to work close to such wires and the possibility that he might, in some way, come in contact therewith *while shoveling coal*, especially with the crane of the shovel and thereby touch or even break the wires, was one that could be reasonably anticipated by the employer. And that such possibility was, in fact, realized, is shown in the claim on the part of the defendant that they warned him against moving the shovel with the crane pointing toward the wires. Again, with the north end of the track of the shovel placed so close to the electric wire, and the coal to be shoveled piled so close thereto, it is maniest that a reasonable man would anticipate that, merely in *swinging the crane around to* shovel the coal, it might come in contact with the wire, charged with electricity and either break or burn it in two whereupon it would fall, and if it, with defective insulation, fell upon or touched the servant, or if the servant touched it, he would be injured. So that we think the duty of keeping the wire properly insulated was a duty the defendant owed to the deceased. And, since electricity is such a dangerous agency when not properly confined, the degree of care required for the *servant's* protection was as great in this case as in the case of anyone else.

Only one more element of the first question above propounded, and being considered, remains, and that is as to whether defendant's negligence, in regard to the insulation, was the *proximate cause* of the injury.

The wire was burned in two, or broke and was caused to fall, by reason of the boom or crane coming in contact therewith, and the question is whether the defective insulation can be said to be the proximate cause of the injury. In considering this feature, the other effects of such breaking of the wire will be dealt with when the question of deceased's contributory negligence is considered. So far as the question of *proximate cause* is concerned, it will be observed that the permitting of the insulation to become defective is the *original negligence,* and the breaking of the wire is an act intervening between the negligence and the injury. But was it an act that broke the chain of causation between the defectively insulated wire and the injury to deceased when he attempted to pick it up? The negligent insulation would necessarily allow the current to escape and injure anyone who touched it or whom it touched, if it fell, and, as we have seen, the liability of its being touched and broken by the boom was something to be reasonably anticipated by the defendant. When this is the case, and the original negligence is such as to be a direct causative force in producing the injury if the reasonably-to-be anticipated event does occur, then when that happens, the original act of negligence is said to be the proximate cause of the injury. [Daneschocky v. Sieble, 195 Mo. App. 470, 474-79; Rose v. Gunn Fruit Co., 211 S. W. 85, 89; Moore v. St. Louis Transit Co., 247 Mo. 227, 236; Williams v. United States, etc., Lamp Co., 173 Mo. App. 87; Dillman v. Burke, 158 Mo. App. 137.; Buckner v. Stock Yards Horse, etc., Co., 221 Mo. 700.]

What has just been said is, of course, on the theory that the intervening act was not *itself an act of negligence* on the part of the injured persons. If the injury would not have occurred but for the act of the deceased in breaking the wire, and *if that act was the result of his own negligence or violation of orders,* then we cannot see how defendant can be held liable for the injury, since, even if the defendant was negligent with regard to the insulation, nevertheless the deceased's

negligence *concurred* with defendant's in producing the injury, and in that event we are unable to perceive how he could recover.   But, for reasons now to be stated, we do not think we can say that *conclusively* deceased was negligent in breaking the wire or in moving the machine with the boom to the north.   In the first place, the evidence as to this comes from defendant's witness, and while plaintiff has no testimony to contradict it, yet the credibility of the witnesses is for the jury.   In addition to this, the coal was piled in the shape of a long rick beside the track and while one end of it was next to the south line of Guinotte Avenue it extended south for some distance alongside and west of the shovel track. There is evidence from which the jury could find that the steam shovel was 150 feet south of Guinotte Avenue when deceased started to move it north, and it is not shown that deceased intended to move the machine to a point *near* the north end of the track or *close* to the wires but only to move it further north than it was. Furthermore, although this particular witness of defendant *says* he directed the deceased never to move the machine north with the boom pointing in that direction, yet he admitted that at the time he gave these directions to deceased, he himself had had only two weeks experience in the work and that he himself frequently moved the machine north with the boom pointing in that direction, so that there is enough in the record to enable the jury, if they so think, to *doubt* the claim of this witness that he told deceased *never* to move the machine north with the boom pointed in that direction.   That the machine must have been considerable distance from the wires when it got beyond control is shown by the fact that the assistant discovered it and got off to get a tie (which they kept for that purpose) to check it but before he could find and use it the machine ran down the grade to where the boom touched and burned, or broke the wires in two.   The evidence further tends to show that the deceased was working the levers and doing his best to stop the ma-

chine but, on account of the *brakes not working,* he was unable to do so in time. Hence, we do not see how we can say that, *conclusively,* the intervening break of the wire was caused by deceased's negligence.

We come now to the *second* question above mentioned, namely, was deceased within the scope of his employment and in the line of his duty when he picked up the wire and was killed? On this branch of the case it may be observed that the evidence is that he, in addition to being engineer of the coal shovel, was one of the two *foremen* at the coal yard, the two working at different times and in different shifts, so that de- ceased *had charge of the coal yard* and the conditions therein at that time. There is no evidence that he was directed or told *not* to pick up fallen wires and to telephone to the repair crew to attend to this, except the evidence of his assistant with the steam shovel who says he suggested this to him, but who would not say the deceased heard him or gave any indication that he did. The wire was not only lying across the west prong of the ''Y,'' on which defendant's cars when loaded with coal would go out of the yard, but it ex- tended across the sidewalk space and out into the paved roadway of the street and there was a consider- able amount of it curled around there, and deceased was performing the services of a foreman of the yard in attempting to get the wire out of the way of his master's work, of which he was in charge, and also out of the way of the traveling public on the highway. Hence we cannot say as a matter of law he was outside the line of his duty. [Ephland v. Missouri Pac. Ry. Co., 137 Mo. 187, 196; Gardner v. St. Louis Screw Co., 210 S. W. 930, 932; Ferlew v. Athletic Mining, etc., Co., 209 S. W. 117, 120; Crecelius v. Chicago, etc., R. Co., 205 S. W. 181; 18 R. C. L. 793, sec. 253.]

The last of the above mentioned questions is, was deceased guilty of contributory negligence? We have already said we could not, as a matter of law, say that he was, in-so-far as his breaking of the wire is con-

cerned. What about contributory negligence in picking it up? In the first place the evidence is such that the jury could well find that the wire was quiet and apparently harmless and showed no signs of fire or life until after deceased picked it up. The evidence tends to show it was the size of a telephone wire, being on a pole *below* the other wires, and deceased had the idea of a telephone wire in his mind, and there is also evidence from which the jury could find that he concluded it was a telephone wire for one of the witnesses said he looked up at the poles and wire before picking it up and another says when he reached the wire he unhesitatingly picked it up. There was insulation on the wire where he picked it up for it came off in his hands when the wire was pulled through. His experience with the insulated cables which furnished power to the electric shovel would lead him to think the insulation was a protection, and insulation is, in itself, a suggestion of safety. [Hill v. Union, etc., Power Co., 260 Mo. 43, 84; City of Tipton v. Rocobs, 47 Ind. App. 681.] With regard to the burning or breaking in two of the wire, the evidence is deceased was working with the levers trying to stop the machine and it is not shown that he knew the wire *burned* in two. With regard to the claim of defendant's witness, Hunt, that he told him it was a live wire, there is evidence that deceased could not hear out of one ear and gave no sign that he heard it if it was said. Furthermore, one of plaintiff's witnesses says when deceased picked up the wire Hunt was not looking at him, as he says he was, but had his back turned to deceased and was working around the steam shovel, so that the question of whether Hunt himself had any idea it was an electric wire, or warned deceased against it, would seem to be for the jury. Under all these circumstances, the question of whether deceased was guilty of contributory negligence in picking up the wire was for the jury. [Powers v. St. Louis Transit Co., 202 Mo. 267, 280; Sprinkles v. Missouri Public Utilities Co., 183 S. W. 1072; Jeffrey v. Union,

etc., Power Co., 171 Mo. App. 29; Kimberlin v. South-western, etc., Telephone Co., 206 S. W. 430; Washburn v. Laclede Gas Light Co., 214 S. W. 410; Lyons v. City of New Albany, 103 N. E. 20.]

So much for the contention that under no possible theory of the case was there a case made for the jury. We come now to matters pertaining to the trial.

First, with regard to the petition, while it does not charge, in so many words, that the defendant failed to furnish the deceased with a reasonably safe place to work, or that the deceased was in the scope of his employment, or in the discharge of any duty he owed the defendant, yet the *facts stated* do show these things so that the petition does disclose the duty owed to the employee by the defendant and a violation thereof in so far at least as the duty to keep the wires *insulated* is concerned. The plaintiff justifies the petition by citing the case of Meeker v. Union, etc., Power Co., 216 S. W. 923, where a petition in nearly the same language was upheld. That case, it will be observed, was not one where a *servant* was suing. There the charge was that the defendant "negligently and carelessly permitted one or more of its said wires to become uninsulated and broken in two and to fall to the surface of said alley," etc.; and the court held that there were three separate and distinct charges and the plaintiff was not compelled to submit all of them but need submit only one, the first. As the plaintiff in the Meeker case was not a servant of defendant who had broken the wire and caused it to fall, the petition in the Meeker case is scarcely a safe model to follow in a case such as the one at bar. However, with regard to the negligence *in regard to insulation* the petition may, perhaps, state a cause of action unless the negligence in this regard be a mere legal conclusion. In the Meeker case, the petition says the defendant negligently permitted the wires to become "uninsulated" while in the case at bar the petition says defendant negligently suffered or permitted the wire "to become defectively insulated." Is

there not a great difference between these two allegations? One says there was no insulation at all and the other says the wire was insulated but was allowed to become defective in some way. Now to say that a thing is *defective* is to plead merely a conclusion. [Martin v. Castle, 193 Mo. 183, 194; Barber Asphalt Paving Co. v. Field, 188 Mo. 182, 204; Booth v. Cheek, 253 Mo. 119, 134.] However, in Von Treba v. Laclede Gas Light Co., 209 Mo. 648, 660, the petition alleged that defendant had allowed its wires to "become defective in insulation" which is practically the same thing, but there the point considered was not that the pleader had stated a mere conclusion. It may be that the charge means that the defendant negligently failed to control its dangerous agency, but is not that also a conclusion? As the case will have to be reversed and remanded for a reason hereinafter stated, we need not decide the question of the sufficiency of the petition, especially as no complaint or attack was made against the petition in the trial court. We call attention to these matters so that they may be obviated. It would seem to be clear that the cause of action pleaded as to the *negligent breaking* and *fall of the wire* is not supported by the evidence, but that is a matter to be considered in connection with the instructions.

Although we think the *evidence* disclosed a possible case for the plaintiff, we do not think the case was submitted upon the case made by that evidence. Plaintiff's instruction submitting the case, reads as follows:

"If from the evidence you find and believe that on or about August 10, 1917, at or near Guinotte avenue and Highland avenue in Kansas City, Missouri, one of the wires of defendant charged with a deadly electric current, through defendant's negligence had become defectively insulated, broken in two and fallen to the surface of the said Guinotte Avenue and onto a certain railway track or tracks extending from defendant's coal yard into said street, and that then and there

plaintiff's husband was an employee of defendant and that in the discharge of his duties as such employee and for the safety of the public he was attempting to remove said wire from the places where it had fallen and was lying, and that while so doing he came in contact with said wire whereby said current escaped therefrom through such insulation, and killed him, your verdict should be for plaintiff, unless from the evidence you further find that deceased was himself guilty of negligence directly contributing to his own injury.''

It will be observed that the above instruction submits the case in the broad general terms of the petition; but, as we have hereinabove shown, the liability of defendant, if there is any liability at all under the peculiar facts of this case, lies within a much narrower compass. Under the evidence *liability*, if any, does not rest upon negligence in allowing the wire to break in two or in permitting it to fall to the ground, but upon negligence in failing to maintain a sufficient insulation, and even though the defendant was thus negligent, yet the injury would not have occurred had not deceased run into and broken the wire down, and if his act in so doing was negligent, or was because of his violation of orders with regard to the boom, then his neglect or wrongful act *concurred* with that of defendant's negligence to produce the injury, and in that event there can be no recovery on the part of anyone whose cause of action is derived through him. But the instruction does not submit the case in terms so that the jury may understand just what are the particular issues which, if found in plaintiff's favor, will result in establishing liability. Under the instruction the jury are told defendant is liable without regard to whether deceased's negligence caused the wire to fall or not. The clause at the latter end of the instruction requiring the jury to find that deceased was not guilty of negligence contributing to his own injury does not cure the defect for that clause would readily be understood to refer to the question of his negligence in picking up the wire, of

which the instruction was speaking. Under the peculiar circumstances of this case, the instruction should not unqualifiedly base defendant's liability upon negligence in allowing the wire to break and in allowing it to fall, along with the other negligence in failing to keep insulated.

Again, the pleading is that deceased was the *operator* of defendant's *coal shoveler* and his duty was to render such services necessary and incidental to the work of loading cars *in its coal yard* and that in attempting to remove the wire "so as to continue said work" he was killed. Nothing whatever is said about the wire having fallen on the highway, of deceased's duty to remove any wire therefrom in discharge of any duty to the public, yet the instruction submits to the jury the issue of whether deceased was in the discharge of his duties as an employee "and for the safety of the public," and submits this issue without qualification or explanation as to what facts should be found in order to determine whether he was in the line of his duty. He was killed at a point 75 feet from the machine on which he was working and the defendant's claim and contention is that he was not in the line of his duty in attempting to pick up the wire. It is true the *evidence* tends to show that deceased was *foreman* over the coal yard, and that the wire lay across the west prong of the "Y" on which cars when loaded with coal went out of the yard, but the pleading says nothing about his being foreman of the yard, but its allegations tend rather to show only that he was the operator of the shovel and had to do only with the work of shoveling coal. And the work being done at the time was not the loading of cars but the transferring of coal from the east side of the shovel track to the ground west thereof. It is well settled that an instruction must submit plaintiff's case within the confines of the petition and the evidence and must not exceed the limits of either and must properly instruct the jury upon the theory of law on which recovery can be had. [Degonia v. St. Louis,

etc., R. Co., 224 Mo. 564, 589; State ex rel. v. Ellison, 270 Mo. 645, 654-5; Schumacher v. Kansas City Breweries Co., 247 Mo. 141, 162.] It is urged that the above instruction is approved and upheld in Meeker v. Union, etc., Power Co., 216 S. W. 923, 930, 931. But the peculiar facts in this case as to deceased's participation in the cause of the break and fall of the wire did not exist in that case; nor did the instruction in that case submit the negligence merely as a legal question, but set forth the *facts* which the jury were to find before reaching a conclusion as to defendant's liability. The plaintiff in that case was not a servant of defendant, had nothing to do with causing the wire to fall but was an innocent member of the public passing along an alley and ran against or touched a wire that was down. The facts are so entirely different as not to make the Meeker case an authority in support of the correctness of the instruction herein. Nor do we think the references in defendant's instructions to "negligence as set forth in the other instructions given" and similar statements is a joinder in such error or a cure thereof. These references were not in stating what negligence was necessary to create liability or make a case for plaintiff. The defendant had demurred to the evidence and was then fighting upon the ground to which it was driven. Such references did not join with plaintiff in any error in the submission of her case, nor did they lead the court into countenancing the error.

Plaintiff's instruction No. 2 told the jury that "plaintiff's husband being dead, and hence his evidence not capable of production here, by reason of the natural instinct of self-preservation *which the law presumes he possessed,* the burden of proof to show that deceased did not exercise due care for his own safety is upon the defendant" and that unless they found from the greater weight of all the credible evidence that he did not exercise ordinary care for his own safety and that his failure to do so directly contributed to produce his own death, they should not find him guilty of contributory

negligence. Now, while this instruction does not, in so many words, tell the jury there was a presumption that deceased was in the exercise of ordinary care, yet that is the *intimation it necessarily carries.* The burden was on defendant to prove contributory negligence regardless of the fact he was dead or of any presumption, hence why state these things as if they were the necessary predicate of the defendant's having the burden of proof? There was no need of saying anything about, a presumption and the only office such a statement could perform would be to convey to the jury the intimation that since the man is dead and we cannot bear what he has to say about it, there is a presumption he was in the exercise of ordinary care. If we are right in this construction of the instruction, it was error to give it, for, as there was evidence as to the facts surrounding and attending the killing, there was no necessity or room for a presumption. [Tetwiler v. St. Louis, etc., R. Co., 242 Mo. 178, 194; DeWitt v. Syfon, 211 S. W. 716, 718; Linderman v. Cormia, 255 Mo. 62, 74; Burge v. Wabash R. Co., 244 Mo. 76, 94.]

For the errors herein above noted we feel constrained to reverse and remand the case for a new trial. It is so ordered. All concur.