D. O. RAMEY v. MISSOURI PACIFIC RAILROAD COMPANY, Appellant.—
21 S. W. (2d) 873.

Division Two, August 6, 1929.

664

*Thomas J. Cole, Arnot L. Sheppard* and *J. C. Sheppard* for appellant.

*Abington, Abington & Freer, Tom W. Campbell* and *John E. Miller* for respondent.

COOLEY, C.—Plaintiff recovered judgment in the Circuit Court of Butler County for $25,000 for personal injuries caused by his being struck by defendant's train, and defendant appeals.

Plaintiff was struck and badly injured by a northbound passenger train of defendant at about eleven A. M., on Sunday, August 10, 1924. The accident occurred upon a public crossing at Russell, Arkansas, a village of about 200 population. Defendant's railroad at that point is spoken of as running north and south, but the direction is

in fact slightly northeast and southwest. One witness said that at the crossing where plaintiff was struck the railroad runs about fifteen degrees east of north. Some 300 feet south of the depot the track curves a little to the west. It is crossed in the village by two east-and-west public roads or streets, one north and the other south of defendant's depot, which stands on the west side of its track and about equi-distant from the two east-and-west roads. Plaintiff was driving eastward, alone, in a Ford automobile, on the road which crosses the railroad north of the depot. Plaintiff's witnesses estimate that crossing to be about 300 to 325 feet north of the north end of the depot, as located at the time of the accident. Measurements proved by defendant show the distance to be 380 feet. The crossing was then somewhat north of the line of the highway, due to the fact that at one time defendant's depot stood across this road and the traveled roadway west of the railroad "angled" to the north to pass around the north end of the depot. The angle or "elbow" in the roadway as then traveled was some fifteen or twenty feet west of the track, from which point one approaching the crossing from the west would go practically northeast, rather more north than east, and, as he neared the crossing, almost north for several feet. On the west side of the railroad track, north of the depot and between it and the highway, there were a semaphore pole and a post bearing a road sign and a mail crane, which witnesses say tended to obstruct the view southward from the highway. A short distance to the north and west of the depot and south of the highway, there were several large trees with low hanging boughs, then in full leaf. Some of these trees were on the railroad right-of-way. There was also an outdoor station toilet near the railroad, apparently south of the depot though this is not clear, and farther south and near the track there were some scattered dwelling houses and a blacksmith shop, the latter being perhaps a quarter of a mile from the depot; all of these buildings being west of the railroad track. There were also some saplings growing west of and near the railroad, south of the south crossing above mentioned. About one hundred feet or so west of the depot there was a graveled pike road running north and south, and on the west side of this pike, fronting it and about 150 feet south of the road plaintiff was on, there was a filling station, at which were several men who witnessed the accident, and gathered about the village well-house or shed northwest of the depot, in the corner east of the pike and south of the road plaintiff was on, were a number of boys and young men who also witnessed it. Beginning at a point immediately north of the crossing on the west side of the railroad track and extending for a distance of some 200 feet northward on the right-of-way near the track, there were railroad ties stacked to a height of

five to seven feet, which obstructed the view northward of one approaching from the west on the highway.

Plaintiff's witnesses testified that a person approaching the railroad track from the west on the road plaintiff was on could not see a train south of the depot on account of the obstructions above mentioned, until within a few feet of the track; some said five or six feet, some seven or eight or ten, but all agreed one would have to be close. One witness, apparently an intelligent man, told it thus:

"Well, we had been viewing the old car wreck where Mr. Ramey was struck and a freight train was coming from the south. Some one made the remark that we could hardly see the train, and we got in different places to see if we could see it, the freight train coming from the south. We were along up about even with the well shed and moved on toward the track. We could see it all right from the pike road and we could see a little glimmer of it as we moved a little further east. Looking on down east of the toilet room there was a space of a few feet we could see it, then we could not see it any more till we got right up close to the track."

On the morning of the accident plaintiff, after procuring some gasoline at the filling station, turned from the pike road into the east-and-west road and drove slowly eastward toward the railroad crossing. He stopped at a point twenty to thirty-five feet west of the track, looked to the south and listened, then started ahead very slowly, looking northward. His speed after he started forward again is variously estimated by witnesses at from two and a half to five or six miles an hour. "About as fast as a man would walk." Defendant's fireman estimates it at eight to ten miles an hour. He had scarcely more than started forward again when those about the filling station and well shed saw the train come into sight at the north end of the depot. Some of them called out to plaintiff, but he did not hear them, and was struck just as the front wheels of his car were about upon or perhaps had dropped over the west rail. Some thought the car stopped an instant before it was struck, as though he had tried to reverse; others thought it did not stop. Plaintiff himself testified that he remembered nothing at all after stopping and looking for the train until he regained consciousness in the hospital. He remembered stopping and looking for possible approaching trains and seeing and hearing none, but his memory stopped there. When he came to himself in the hospital he did not know what had happened to him.

The train which struck plaintiff was a through passenger train, consisting of engine and tender and eleven or twelve cars. It was not scheduled to stop at Russell and was running at a speed variously estimated at from forty to fifty miles an hour, being perhaps a little late, but nearly on time. The engine whistled for the station at a

whistling post about a quarter of a mile south of the depot, but according to plaintiff's evidence, of which there was an abundance on this point by a dozen or more unimpeached witnesses, the whistle was not sounded thereafter, nor was the bell rung at all, no signal or warning of the train's approach being given for the crossing on which plaintiff was struck. Most of the witnesses seem not to have heard the train till about the time it appeared from behind the depot. It could not have been making a great deal of noise, as one witness's attention was first attracted to it at that point by his hearing the "clicking" of the rails and the running noise of the train at about the same time.

Plaintiff, had he looked to the south again after stopping and starting forward as above described, could have seen the train when and after it passed the north end of the depot, and defendant's fireman from that point could and did see plaintiff approaching the track. No effort was made to warn plaintiff, the fireman testifying that when he first noticed him plaintiff was twenty or thirty feet from the crossing, approaching it slowly, not faster than eight or ten miles an hour, and the engine was about at the north end of the station; that he thought plaintiff would stop, and that when he realized plaintiff was not going to stop the train was within twenty or thirty feet of him (on cross-examination he said fifty or sixty feet) and too close to avoid the collision. The engineer testified that he did not see plaintiff, his station being on the right or east side of the cab and his view to the west of the crossing being cut off by the boiler; that when within twenty-five or thirty feet of the crossing the fireman called to him and he applied the emergency brakes, knowing that something was wrong, and stopped in about 1,000 to 1200 feet.

Plaintiff pleads three sections of the Arkansas statutes as follows:

"Sec. 8562. All railroads which are now or may be hereafter built and operated in whole or in part in this State shall be responsible for all damages to persons and property done or caused by the running of trains in this State.

"Sec. 8568A. A bell of at least thirty pounds weight, or a steam whistle, shall be placed on each locomotive or engine, and shall be rung or whistled at the distance of at least eighty rods from the place where the said road shall cross any other road or street, and be kept ringing or whistling until it shall have passed said road or street, under a penalty of two hundred dollars for every neglect, to be paid by the corporation owning the railroad, one-half thereof to go to the informer and the other half to the county; and the corporation shall also be liable for all damages which shall be sustained by any person by reason of such neglect.

672

"Sec. 8575. In all suits against railroads, for personal injury or death, caused by the running of trains in this State, contributory negligence shall not prevent a recovery where the negligence of the person so injured or killed is of less degree than the negligence of the officers, agents or employees of the railroad causing the damage complained of; provided, that where such contributory negligence is shown on the part of the person injured or killed, the amount of recovery shall be diminished in proportion to such contributory negligence."

The negligence charged in the petition is:

"That the defendant, its agents, servants and employees then and there in charge and operating said train wholly failed and neglected to sound the whistle or ring the bell upon the locomotive of said train continuously throughout the last eighty rods traversed by said train immediately before said train reached the said street crossing at which said train struck and injured plaintiff, as was their duty so to do under the laws of the State of Arkansas hereinabove set out."

Defendant by its answer admits the existence of the pleaded statutes, denies plaintiff's allegations of negligence, and pleads that plaintiff negligently failed to look or listen for the approaching train at a point where he could have seen same and could have stopped and avoided the injury, and that plaintiff "carelessly and heedlessly failed to listen for the whistle and the bell and alarms which were being given at the time he approached said street crossing, and negligently and carelessly drove upon said track and was injured, and that his said negligence and carelessness was the sole contributing cause of such injuries as he may have received by reason of said accident, if any, and said negligence is hereby pleaded in bar of this accident."

I. Appellant strongly urges that the court should have sustained its demurrer to the evidence on the ground that from the evidence it appears conclusively that plaintiff was guilty of contributory negligence equal to or greater in degree than that of the operators of the train. We think otherwise. If it be conceded that plaintiff was negligent in not again looking to the south after he had stopped, looked and listened at a point twenty to thirty-five feet from the track and discovered no signs of an approaching train, contributory negligence does not bar his right to recover under the Arkansas statute pleaded unless his negligence equalled or exceeded that of defendant's servants in charge of the train. Though from the point at which he stopped he could not see the approaching train south of the depot, he could doubtless have heard the statutory signals had they been given, and may reasonably have supposed that if a train

were approaching from that direction those in charge of it would perform their duty of giving such signals, especially in approaching and passing through the village. He had not been able to see the track northward on account of the ties piled near it and was probably trying as he approached the crossing to get a view in that direction. He was then moving northeast, or perhaps more nearly north, so that he would have had to turn his head sharply to the right in order to look south as he reached the point from which he could first expect to see to the north from behind the pile of ties. Plaintiff's evidence, which in determining a demurrer must be assumed to be true, shows that neither whistle nor bell was sounded for the crossing. When the train was at the north end of the depot defendant's fireman saw plaintiff twenty or thirty feet from the crossing, approaching it steadily and apparently oblivious of the train's approach, and even then no warning or signal was given. Had he been warned plaintiff could have stopped in two or three feet, and had defendant's servants in charge of the train at that time performed the duty enjoined upon them by the statute, plaintiff's injury no doubt would have been averted. In these circumstances the court could not say as a matter of law that plaintiff was guilty of negligence equalling or exceeding that of defendant, and rightly left it to the jury.

In discussing a like question in Hiatt v. St. Louis-San Francisco Ry. Co., 308 Mo. 77, 271 S. W. 806, a crossing case involving the same Arkansas statutes and in which the plaintiff, on approaching the railroad, could have seen the train when she was much farther from the track than was plaintiff in this case had not her attention been momentarily distracted, the court said (308 Mo. l. c. 96):

". . . the doctrine of comparative negligence is by statute made a part of the law of Arkansas, and it was for the jury to determine the relative negligence of defendant and plaintiff, and this they have done, adversely to defendant."

Allnutt v. Mo. Pac. Railroad Co., 8 Fed. (2d) 604, and Bradley v. Mo. Pac. Railroad Co., 288 Fed. 484, cited by appellant in support of this contention in its brief, in which it was held that a demurrer was properly sustained, are distinguishable on the facts from the instant case. Three Missouri cases are cited in support of the claim that there are no degrees of negligence in Missouri or in Arkansas, viz.: McPheeters v. Railroad, 45 Mo. 22; Reed v. W. U. Tel. Co., 135 Mo. 661, and Magrane v. St. Louis Sub. Railroad, 183 Mo. 119. The first two hold that there is no difference legally between negligence and gross negligence; the last that while there are different degrees of care required under different circumstances, there are, properly speaking, no different degrees of negligence. Those cases have no application to the Arkansas statute under consideration.

674

II. Appellant assigns error in the giving of plaintiff's instruction numbered 1, telling the jury that "if you find from a preponderance of the evidence in this case that the defendant railroad company, by the running of its train, struck and injured the plaintiff, then that is prima-facie evidence of negligence on the part of the defendant railroad company;" and it cites cases holding that negligence will not be presumed, and when alleged must be proved, together with a causal connection between the negligence and the injury alleged. Such is the general rule, but there are other considerations to be taken into account in this case.

1. The same Arkansas statutes pleaded here were relied upon and were carefully considered in this court in Hiatt v. Ry. Co., supra. The facts were similar and an instruction of like effect as plaintiff's Instruction 1 was given, in discussing and approving which the court said, l. c. 99:

"We have quoted, supra, Section 8562, upon which this clause of the instruction is based. This statute was pleaded and proven as a part of plaintiff's case. The Arkansas decisions construing the statute are in evidence. In other words, this is a case which is governed wholly by Arkansas law. We should give to such foreign statute the meaning given to it by the highest tribunal of Arkansas. This statute was enacted in 1875, and the universal construction has been that where it is shown that an injury to either property or person has been occasioned by a moving train, proof of the fact that the injury was so inflicted, and of the injury, a statutory presumption arises that such injury was the result of the negligence of the railroad. . . . The statute itself says nothing about presumption of negligence, but the Supreme Court of Arkansas has ruled from first to last that such presumption inheres in such statute. It is a statutory right, granted by substantive law to every person injured by a moving train."

And further, on page 101:

"From first to last the Arkansas court has held that, under this statute, Section 8562, when it is shown that death or injury to a person has been occasioned by a moving train, then there is a presumption of negligence as against the railroad, and the railroad is then called upon to clear its skirts by showing that it has not been guilty of negligence. This is substantive, statutory law, and not a mere rule of procedure. The presumption inheres in the cause of action itself. The court calls it 'a statutory presumption,' created by the statute which gives the right of action, and fixes the liability. Plaintiff's instruction, so far as the clause that we first quoted, supra, is proper."

The trial court doubtless followed the Hiatt case in giving Instruction 1. Appellant suggests in its brief that the Arkansas decisions construing the statute are not pleaded as they were in the Hiatt case. But the statute is pleaded and we are called upon to construe it. Having but recently considered and construed this statute, which is the same now as it was then, and there being no showing or contention that the construction put upon it by the Arkansas courts has been changed, we see no good reason why the conclusion as to its meaning and effect reached in the Hiatt case may not now be referred to, together with the reasons therefor, which include the holdings of the Arkansas courts there considered. In Texas it has been held that "our courts do not take judicial notice of the laws of other states; but, where the statutes of another state are pleaded and proven, the courts of this state will refer for its construction to the reported decisions of that state." [Ogg v. Ogg (Tex. Civ. App.), 165 S. W. 912. See also Eastern Building & Loan Assn. v. Williamson, 189 U. S. 122, 47 L. Ed. 735.]

2. We think, too, that our own statute authorizes us to notice the Arkansas decisions construing the statute in question. Section 5336a, Laws 1927, page 156, provides:

"In every action or proceeding wherein the law of another state of the United States of America is pleaded, the courts of this State shall take judicial notice of the public statutes and judicial decisions of said state."

By providing that when the *law* of another state is pleaded our courts shall take judicial notice of the law *and judicial decisions* of such state, we think the Legislature meant that pleading the statute should bring before the court the judicial construction of that statute as interpreted by the courts of the state in which it was enacted. Such seems to be the reasonable interpretation of Section 5336a, supra. The construction put upon a statute by the courts of the state in which it was enacted becomes in effect a part of the statute. When such statute is pleaded why should not the court required to construe it be thereby authorized to seek its meaning and effect from decisions of the court whose official duty it is to determine that question?

3. Furthermore, we think appellant has invited our attention to such Arkansas decisions. In Point 6 of its brief it asserts that Sections 8562 and 8575 of the Arkansas statute pleaded "and the construction by the Arkansas courts placed upon said statutes, which has not been pleaded," are rules of practice and evidence and therefore do not govern in the courts of this State. To determine the "construction by the Arkansas courts placed upon said statutes," as we are thus asked to do, the decisions of course must be examined.

For the reasons stated we conclude that the decisions of the Arkansas courts construing the statutes in question may properly be considered.

III. If the decisions of the Arkansas courts construing the statutes pleaded are not to be considered, appellant is in no better case. Given a literal construction, Section 8562 purports to create an absolute liability, regardless of negligence. See Hiatt v. Ry. Co., supra, where this question is fully discussed. It is only by reason of the construction put upon it by the Arkansas courts that the statute has been held to mean that proof of injury by a moving train, without proof of negligence, makes only a prima-facie case for plaintiff instead of a conclusive case as the literal terms of the statute would indicate. The instruction complained of tells the jury that the facts hypothesized make a prima-facie showing of negligence on the part of defendant. This is in accord with the statute as construed by the Arkansas courts, but less favorable to plaintiff and more favorable to defendant than would be a literal interpretation of the statute. So it is difficult to see how defendant could have been prejudiced by the giving of the instruction, especially since plaintiff's instructions numbered 5 and 6, which submitted the case on the theory of the petition and told the jury what facts must be found to authorize a verdict for plaintiff, required the jury to find from the preponderance of the evidence the negligence of defendant, specifying the acts of negligence pleaded, and that plaintiff's contributory negligence, if any, was of less degree than said negligence of defendant. Instructions 5 and 6 are not criticised.

"The Supreme Court or Courts of Appeals shall not reverse the judgment of any court unless it shall believe that error was committed by such court against the appellant or plaintiff in error, and materially affecting the merits of the action." [Sec. 1513, R. S. 1919.]

We rule this assignment against appellant.

IV. The contention urged by appellant in Point 6 of its brief, that the Arkansas statutes pleaded, as construed by the courts of that state, are merely rules of practice and evidence rather than substantive law and therefore not to be applied, since in such matters the law of the forum governs, is answered adversely to appellant in Hiatt v. Ry. Co., supra. The same contention was there made and was fully considered by the court. We are satisfied with the reasoning and the ruling in the Hiatt case and it would serve no useful purpose to discuss that question further.

V. Error is charged in the giving of instructions numbered 2 and 4, on the ground that they merely state abstract propositions of law. Instruction 2 states the Arkansas law requiring the sounding of bell or whistle. Instruction 4 states in substance that in suits against railroads for personal injury caused by the running of trains in Arkansas, contributory negligence does not prevent recovery where the negligence of the person injured is of less degree than that of the employees of the railroad causing the damage complained of. Other instructions apply these principles to the case on trial. The legal propositions stated in those two instructions were applicable to the case and had they been embodied in the instructions applying them to the case we apprehend no criticism would be offered. We think the jury was not misled nor defendant prejudiced by the mere fact that they were stated in separately numbered instructions.

VI. Plaintiff's Instruction number 7 is assailed, appellant claiming that the concluding portion thereof, hereinafter quoted, conflicts with plaintiff's Instruction 5 and is erroneous in that it authorizes recovery whether the contributory negligence of plaintiff is less, equal to or greater than the negligence of defendant's employees. We think the instruction is not subject to such construction. It deals only with the measure of damages and could not reasonably have been understood by the jury otherwise. It begins thus:

"The court instructs the jury that if from the evidence in this case you find a verdict for the plaintiff, you will assess his damages at such sum as you may find and believe from the evidence will fairly and reasonably compensate him for the injuries, if any, plaintiff has sustained as a direct result of having been struck by defendant's train; and in fixing the amount of such damages you may take into your consideration . . ."

It then enumerates the various things the jury may consider in estimating the damages and concludes as follows:

". . . and you may consider all of these matters in fixing the amount of his damages, if any, by reason of said injuries, and provided that if you find from the testimony that the plaintiff was guilty of contributory negligence in going upon defendant's track in the manner that he did, then the amount of his damages should be diminished in the proportion that you may find and believe from the evidence that the contributory negligence of the plaintiff bore to the negligence of the employees of the defendant railroad company in charge of the train that struck the plaintiff, if you find said employees were negligent."

In plaintiff's instructions numbered 5 and 6, submitting his case and stating the facts that must be found to authorize recovery, and in defendant's instructions as well, the jury was clearly informed that plaintiff could not recover at all unless his contributory negligence, if found, was of less degree than the negligence of defendant as specified. Reading all the instructions together, as they must be read, and keeping in mind that Instruction 7 dealt only with the measure of damages and that the jury was clearly informed as to the effect of plaintiff's contributory negligence, if found, by other instructions dealing directly with that issue, we are convinced that the jury could not have been misled or confused by the concluding part of Instruction 7.

VII. It is urged that the verdict is excessive, and so much so as to show that it is the result of passion and prejudice. At the time of his injury plaintiff was thirty-one years of age, with a life expectancy of 34.6 years, and had been a healthy, able-bodied, industrious man, earning approximately $3,000 a year by farming and buying, cutting and selling timber. In both the farming and timber operations he and a brother-in-law worked together, doing as much of the work as possible themselves, and employing some additional labor. Plaintiff had been married about a month at the time of his injury.

By the force of the collision plaintiff was hurled a distance of seventy or seventy-five feet and high enough in the air to be seen over the top of the train, and when friends reached him he was bleeding at nose, ears and mouth, unconscious and seemingly dead. His condition was such that for some hours the surgeons delayed operating, thinking he would die. The nurse who attended him testified that when brought to the hospital he was so badly bruised she could not tell whether he was white or colored. He remained unconscious for ten days, and remained in the hospital twenty-five days, and was then taken home. At home he was kept in bed for "a good while," but just how long is not shown. He sustained, besides severe cuts and bruises, a dislocated and broken collar bone, a broken nose, and a compound, compressed fracture of the skull on the left side, both plates of the skull being "crushed and mashed down on the brain." The broken skull had ruptured a blood vessel of the brain, causing a blood clot to form beneath the fracture. A trephining operation was performed and this clot removed. A piece of the skull about the size of a half dollar was removed in the operation and there is now a "much depressed" place at that point, protected only by the scalp, membrane and scar tissue. His spine was severely injured, wrenched and "jammed," the cervical, dorsal and lumbar regions all being

affected, and he sustained a very serious nervous shock and of course suffered great pain.

As the result of his injuries plaintiff's whole left side is partially paralyzed, the condition being described as a progressive paralysis and atrophy of the muscles on that side, the motion of the left hand and arm being now impaired seventy to eighty per cent. Dr. Gray, a surgeon who helped perform the operation and who examined plaintiff thoroughly the night before the trial, described his condition at the time of the trial, May, 1926, thus: "He is wasting away. The left arm, the left leg and the entire side is emaciating or wasting away. That is what we call atrophy. That is going on now. It is what we call progressive atrophy. It comes on slowly. At the present time he hasn't much motion in his left arm and has practically no use of his left hand at this time. The whole left side of his body is affected." Dr. Gray further stated that plaintiff's lumbar vertebrae seem to be stiff. His left arm and leg are an inch smaller than the right and are becoming soft and flabby. In the opinion of the doctors the paralysis and atrophy are progressive and incurable. The paralysis being on the left side of the body the doctors were of the opinion that there was an injury to, or blood clot on, the right side of the brain. The atrophy is attributed to some injury to were of the opinion that there was an injury to, or blood clot on, the right side of the brain. Plaintiff's neck is stiff, the motion being reduced twenty to twenty-five per cent, the head drawn a little to one side, the "up and down" motion impaired and "in order to rotate his head he has to turn his body." The neck is not in a natural condition.

Plaintiff has been rendered impotent, and the medical witnesses were of the opinion that there is no likelihood of restoration of his sexual powers. His heart action is erratic. Dr. Evans, the physician who treated him after he left the hospital and during the balance of the year 1924, described his condition during all that time as follows: "He was highly nervous and his pulse was very poor. Some days he seemed to be better, but that would last only a very short time till he was all shot to pieces again. He had a very peculiar pulse. I have examined him and found his pulse at 120 a minute, and in ten minutes I would examine him again and it would be down to eighty a minute, and then in ten minutes it would be back up to 100. His pulse was very irregular. This was caused by the governor being just knocked out. The heart beats were paralyzed to a certain extent, and the heart just went any way and every way." Dr. Evans said further that plaintiff is losing the use of his left side.

The evidence of physicians who examined plaintiff just before the trial was that his nervous condition is bad, that he is highly nervous, and that sensation as well as motion of the left side is impaired. The

several physicians all testified that plaintiff's injuries are permanent and in their opinion his condition will progressively become worse. Dr. Gray testified that a case of paralysis like plaintiff's comes on gradually; that plaintiff may not reach his worst for several years, but will gradually become worse.

Plaintiff testified that he cannot sleep well; is reduced in weight from his former normal weight of 185 pounds to 150 pounds; that he is very nervous; that when he attempts to turn his head it pains him; that he has suffered pain from his injuries practically all the time since his injury; the pain being in his shoulders, neck, spine and breast, and when he takes cold, in his head. He testified further that all the work he had been able to do since the accident was about four weeks' work at a filling station, for which he received five dollars per week; that he started to "share crop" with another man, but was not able to work and had to abandon it, and tried in 1924 to work in the garden, but would get nervous and take the headache and have to quit; that he could not work more than fifteen or twenty minutes without having to lie down. He says he cannot use his left arm at all.

It was shown that plaintiff had paid or incurred bills for surgical, medical and hospital treatment and nursing aggregating $675.

At the expense of brevity we have set out plaintiff's injuries as shown by the uncontradicted evidence at some length, because of appellant's insistence that the verdict is excessive. That plaintiff was very seriously injured and that he must have suffered greatly does not admit of question. He will undoubtedly continue to suffer pain, both physical and mental. His ability to do renumerative labor is destroyed. He has been rendered impotent and practically a physical wreck. It is not shown that plaintiff is educated or equipped to carry on a profession or business not requiring manual labor. Instead of being a sound, healthy man, capable of performing the duties and enjoying the pleasures of active life and the satisfaction of self-supporting participation in the activities of his community, plaintiff has been reduced to a state of practical helplessness, a charge upon rather than the head and supporter of a family.

We have examined the cases cited by both appellant and respondent on this question. Appellant cites Trowbridge v. Payne, 269 S. W. 610; Brock v. C. R. I. & P. Railroad Co., 305 Mo. 502, 266 S. W. 691, and Boyer v. Mo. Pac. Railroad Co., 293 S. W. 386. Respondent cites Pulliam v. Wheelock (Mo.), 3 S. W. (2d) 374; Hughes v. Ry. Co., 309 Mo. 560, 586, 274 S. W. 703; Meeker v. Union Elec. L. & P. Co., 279 Mo. 574, 216 S. W. 923, and Myers v. C. B. & Q. Railroad Co., 296 Mo. 239, 246 S. W. 257. In the cases cited by appellant the judgments were reduced to sums less than the amount of this verdict. But the injuries were less or there was less earning

capacity shown. In the cases cited by respondent we think the amounts allowed were fully as large proportionately as the sum awarded in this case, the nature and extent of the injuries and plaintiff's age and earning capacity considered.

Former adjudications can furnish at best only a general guide for determining what sum should be allowed where the injuries are of the nature shown in this case, because in no two cases are the injuries and the effects thereof the same. For example, in none of the cases cited do we find the element of impotency along with such serious and permanent injuries as shown here. We have not overlooked appellant's suggestion that if plaintiff was guilty of contributory negligence the damages should be reduced in proportion to such negligence. But, as said in the Hiatt case, supra, 308 Mo. page 96, if the jury concluded there was contributory negligence the presumption is that they decreased the damages awarded in proportion to such contributory negligence.

Taking into consideration all the facts and circumstances shown we are not prepared to say that the verdict is excessive.

We find no reversible error in the record and the judgment is accordingly affirmed. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.