JANIE JACKSON, ADMINISTRATRIX OF ESTATE OF J. C. JACKSON, DECEASED, RESPONDENT, v. ST. LOUIS-SAN FRANCISCO RAILROAD COMPANY, APPELLANT.—31 S. W. (2d) 250.

Springfield Court of Appeals. August 25, 1930.

*E. T. Miller* and *Mann & Mann* for appellant.

*Sizer & Gardner* and *Johnson & Jones* for respondent.

BAILEY, J.—This is an action for damages for the death of plaintiff's husband and intestate, instituted by her as administratrix for the benefit of the lawful heirs of deceased, consisting of herself and a number of minor children. The accident occurred on October 7, 1926, near Milfay, Oklahoma, and the remedy is governed by the laws of that State, duly pleaded in this action. The death of plaintiff's husband, J. C. Jackson, was occasioned when his automobile, which he was driving at the time, was struck by one of defendant's locomotives on a public railroad crossing. The negligence pleaded and relied on for recovery was in three particulars, i. e., (1) high, reckless and excessive rate of speed; (2) construction and maintenance of a dump or embankment over defendant's tracks too narrow for vehicles to meet each other and pass thereon with reasonable safety; (3) and failure to ring the bell or sound the whistle on said locomotive as it approached said crossing. The answer contained a general denial and, as an affirmative defense, alleged that deceased was guilty of negligence which directly contributed to his death in that he did not stop his truck before going upon the track, as required by the statutes of Oklahoma, and in that he failed to look and listen for approaching trains before entering upon the track or, if he did look or listen, that he failed to heed what he could have seen or heard by the exercise of ordinary care. The Oklahoma laws pleaded in both the petition and answer will be referred to in more detail hereinafter. Upon the issues thus outlined the cause was submitted to a jury and resulted in a judgment and verdict for plaintiff in the sum of $6000, from which judgment defendant has appealed.

This suit was first before this court at the March term, 1929, and an opinion was rendered reversing the judgment. Thereafter, at the October term, 1930, a motion for re-hearing was sustained, after which the cause was re-argued at the January, 1930, called term, of this court.

Under the assignment of errors the first question to be considered is whether or not the court erred in overruling defendant's instruction in the nature of a demurrer to the evidence. It is urged that deceased was guilty of contributory negligence as a matter of law. It was on this theory we decided to reverse the judgment in our former opinion and our view of the evidence has not changed. But, touching on this proposition, plaintiff pleaded section 6 of the constitution of the State of Oklahoma by the provisions of which the defense of contributory negligence, in all cases, is a question of fact

and at all times to be left to the jury. On defendant's motion that portion of plaintiff's petition pleading this constitutional provision was stricken out upon the theory that said provision had to do with the remedy and not the right, and that in the trial of cases in Missouri matters of procedure are to be governed by the laws of this State.

In our former opinion this point was not discussed because we deemed it waived by plaintiff in her brief. Both plaintiff and defendant have filed briefs covering this question since the motion for re-hearing was sustained. Defendant first asserts that plaintiff may not now urge this question because she failed to save exceptions to the action of the trial court in striking out that part of her petition in which she pleaded the constitutional provision aforesaid and because the matter was not presented to the trial court for review by motion for new trial or otherwise, citing Caldwell v. Travellers Insurance Company, 305 Mo. 619, 267 S. W. 907. That case is not in point here. If it be true that the constitutional provision in question is part of the substantive law of Oklahoma and inheres in plaintiff's cause of action, it remained in the case because most of the Oklahoma cases pleaded by both plaintiff and defendant recited this constitutional provision and the decisions were based upon that proposition. It is conceded this case must be decided, except as to procedure, by the law of Oklahoma. To the law of that State, as evidenced by the pleaded statutes and decisions of its highest tribunal, we must look, in order to determine just what plaintiff's rights were.

The constitutional provision in question reads as follows:

"The defense of contributory negligence or assumption of risks shall, in all cases whatsoever, be a question of fact, and shall at all times be left to the jury." [Art. 23, sec. 6, Okla. Const.]

If defendant's contention that this constitutional provision is purely a matter of procedure is correct, then of course the courts of this State are not required, by comity, to follow the Oklahoma procedure. The provision above quoted is clear and couched in the strongest language. The Supreme Court of Oklahoma, in its decisions, has uniformly adhered to this provision in its strictest sense. By its plain terms, neither the courts nor the Legislature of Oklahoma may define contributory negligence as a matter of law. A discussion of the rule here involved is contained in the case of Missouri, K. & T. Ry. Co. v. Stanton, 189 Pac. 753, a crossing case where two boys were killed while driving a team of mules across defendant's tracks. There was evidence that they did not stop, look and listen for the train. The trial court refused an instruction for defendant covering that phase of the case. The Supreme Court of Oklahoma, in passing on the question thus presented, uses language, as follows: "The defendant complains that the court erred in refusing to give the instructions requested by the defendant to the effect that, if the conditions

surrounding the crossing and the passage of a train thereon were such as to require a traveler in the exercise of reasonable care to stop in addition to looking and listening upon approaching the crossing, then a failure of deceased to stop constituted negligence on his part. We do not understand that it is a matter of law in this State that a person in approaching a railroad crossing must stop in addition to looking and listening. Before the plaintiff was entitled to recover, the burden of proof was upon him to show by a fair preponderance of the evidence that the boys at the time they were killed were in the exercise of due care for their own safety, and were killed as the direct and proximate result of the negligence of the defendant company. The deceased and the company both had the right to use the crossing where the accident occurred. The law imposed upon both the duty of using reasonable and ordinary care to avoid accident and danger. If the deceased boys failed to exercise reasonable and ordinary care and precaution to avoid the accident, that is, such care and caution as reasonably prudent boys of their age, maturity, intelligence, and experience would be reasonbly expected to exercise under the circumstances, then plaintiff was not entitled to recover, and if the defendant failed to use reasonable and ordinary care to avoid accident and danger on the occasion, then the defendant would be guilty of negligence. It is not the province of the court to particularize what acts shall constitute negligence, or what acts shall constitute ordinary care. This is a question solely for the jury. It is for the jury to say from all the facts, the circumstances, and the surroundings at the time whether or not ordinary care and caution were used. It is true the statute requires a specific duty on the part of the railroad company as to the blowing of a whistle or ringing of the bell, but otherwise the court is positively prohibited from saying to the jury what acts, shall constitute negligence in a given case.

It was the duty of the defendant company, as well as the deceased, to exercise care commensurate with the surroundings to avoid the accident, and if the circumstances were such as to require the deceased to stop, that is, if the evidence showed or disclosed that they knew the train was coming, or that they heard the train, and that they wantonly disregarded these warnings, then, in that event, the jury would, no doubt, have drawn the conclusion that it was their duty to stop. But this cannot be a question of law for the court; probably under those conditions no jury would have found that they were in the exercise of ordinary care and caution. [2 l. c. 754, 755.]

In another Oklahoma crossing case the Supreme Court said: ''The defendant next complains of the refusal of the trial court to give the following instruction: 'You are instructed therefore that it is the duty of a person about to cross a railroad track to make a vigilant use of his senses in order to ascertain if a train is approaching,

and it was the duty of the plaintiff, on approaching the tracks of the defendant to look and listen for approaching trains before attempting to cross said track and it was her duty to keep her faculties in active exercise and not permit her attention to be diverted from the danger before her, and this duty rested upon her with respect to the track which she was attempting to cross at the time she was struck by one of the defendant's trains.'

" (6, 7) It is contended by the plaintiff that the refusal of this instruction was not error because the question of contributory negligence is one for the jury, and that this court so held in Wichita Falls & N. W. Ry. Co. v. Woodman (Okla. Sup.), 168 Pac. 209.

" 'The court should simply define the meaning of the term "contributory negligence" as used in section 6, article 23, Williams' Constitution, and leave it to the jury to say whether the plaintiff's negligence had or had not contributed to the injuries complained of.'

"Under the above case and a long line of other decisions, this court has committed itself to the view that the trial court should not instruct the jury that, if a certain state of facts is found to exist, such facts constitute contributory negligence and the plaintiff cannot recover; but none of these cases hold that it is not the duty of the trial court, upon proper request being made, to instruct the jury what duty the law imposes upon the plaintiff as well as the defendant and that a breach of that duty is negligence. In no other manner can the jury be advised as to the relative duties of the parties. The requested instructions correctly stated the duty resting on a traveler upon a public highway before entering upon a railway crossing." [Hines v. Deen (Okla.), 220 Pac. 860, 1. c. 862.] "

In the case of St. Louis & S. F. Ry. Co. v. Russell, 130 Okla. 237, 266 Pac. 763, the second paragraph of the syllabus reads as follows: "2. Under section 6, article 23, Constitution of Oklahoma, the jury alone can determine whether such facts as they find to exist constitute contributory negligence, and it is not error for the trial court to refuse to instruct the jury that a certain state of facts, if found to be true, constitute contributory negligence."

To the same effect are St. Louis-San Francisco Ry. Co. v. Ford, 281 Pac. 248; Midland Valley R. R. Co. v. White, 109 Okla. 60, 234 Pac. 762; St. Louis-San Francisco Ry. Co. v. Thompson, 281 Pac. 565. Further reference to Oklahoma decisions seems unnecessary.

That this constitutional provision conferred a substantial right upon plaintiff seems to be recognized in the case of Chicago R. R. Co. v. Cole, 251 U. S. 54, 64 U. S. (L. Ed.) 133, wherein the legality of this section of the Oklahoma Constitution was upheld. The Supreme Court of the United States said: "It is said that legislation cannot change the standard of conduct, which is matter of law in its nature, into matter of fact, and this may be conceded; but the

material element in the constitutional enactment is not that it called contributory negligence fact, but that it left it wholly to the jury. There is nothing, however, in the Constitution of the United States or its amendments, that requires a State to maintain the line with which we are familiar between the functions of the jury and those of the court. It may do away with the jury altogether (citing cases). . . . Provisions making the jury judges of the law as well as of the facts in proceedings for libel are common to England and some of the States, and the controversy with regard to their powers in matters of law more generally as illustrated in Sparf v. United States, 156 U. S. 51, 39 L. Ed. 343, 15 Sup. Ct. Rep. 273, 10 Am. Crim. Rep. 168, and Georgia v. Brailsford, 3 Dall. 1, 4, 1 L. Ed. 483, shows that the motion is not a novelty. In the present instance the plaintiff in error cannot complain that its chance to prevail upon a certain ground is diminished, when the ground might have been altogether removed.''

A question somewhat similar to the one here involved arose in the case of Hiatt v. R. R., 308 Mo. 77, 271 S. W. 806. There the cause of action arose in Arkansas and the effect of an Arkansas statute, providing that railroads should be responsible for all damages to persons or property done or caused by the running of trains in that State, was considered. Judge GRAVES, of the Missouri Supreme Court, speaking of this statute said:

''We should give to such foreign statute the meaning given to it by the highest tribunal of Arkansas. This statute was enacted in 1875, and the universal construction has been that, where it is shown that an injury to either property or person has been occasional by a moving train, proof of the fact that the injury was so inflicted, and of the injury, a statutory presumption arises that such injury was the result of the negligence of the railroad.''

The court further said: ''Much is said in the briefs that the statutory presumption of negligence, ruled in all Arkansas cases, is not applicable to a trial of the issues in Missouri, because it is a mere matter of procedure, and is adjective law rather than substantive law, and is therefore governed by the law of the forum. The trouble with this contention lies in the fact that the statute has been overlooked.''

After comparing the Arkansas Law with our fire statute as to railroads, the court used language, as follows:

''The construction given makes this statute read that a prima-facie case is made for plaintiff by proof of injury without proof of negligence. This is substantive statutory law, and not procedure merely. It is a substantive right conferred upon our citizens in fire cases under our fire statute. In the instant case, the plaintiff (under the court construction of the statute) had the statutory right to a verdict. Unless the defendant cleared its skirts of blame.'' . . .

"We rule that the statute, as construed by the Arkansas Supreme Court (which construction becomes a part and parcel of the statute so far as Missouri courts are concerned in trying a case under it), gives to plaintiff a substantial and substantive right, and is not a pro-. cedural statute at all."

The rule adopted in the Hiatt case was followed in the more recent case of Ramey v. Missouri Pac. Ry. Co., 21 S. W. (2d) 873.

We are unable to perceive any substantial distinction between the Hiatt case and this case on the point in question. In the Hiatt case the mere fact that an injury was caused by the running of trains did, under the law of Arkansas, make a prima-facie case for plaintiff. Under the Missouri law, where the case was tried, no such statute exists and the burden of proving negligence would, under like circumstances, have been upon plaintiff. But since the provision of the Arkansas statute referred to was held to be a part of the substantive law of Arkansas, the presumption of negligence was permitted to prevail in the Missouri courts. So in the case at bar, the burden was upon plaintiff to prove defendant's negligence. Having done so, she made a prima-facie case which entitled her to submit the question of defendant's liability to a jury, notwithstanding the contributory negligence of her husband if any there was. This, we think, is something more than a mere matter of procedure.

As Justice HOLMES said in the Cole case, supra, it "diminishes," defendant's chance to prevail. That such provision places plaintiff in an advantageous position cannot be denied. It is a substantial right and thoroughly embodied in the law of Oklahoma by its constitution and Supreme Court decisions. The question of contributory negligence as a matter of law is abolished. It is always a qestion of fact in Oklahoma. We construe it to be a part of the substantive law of Oklahoma and therefore believe the lex loci on this question must be followed. This notion is, we think, supported by the Hiatt case, supra. A similar view was taken in regard to the same question by the Supreme Court of Alabama in Caine v. St. Louis-S. F. Railway Co., 209 Ala. 181, 95 So. 876, 32 A. L. R. 795. An identical constitutional provision was considered in Railroad v. Spencer, 20 Fed. (2d) 714, wherein the Federal court held that such a provision lays down a rule of substantive law rather than procedure and "cuts deep into the right, observed at common law, by which a defendant can obtain a decision by the court upon a proven state of facts."

Defendant cites a great number of cases in support of its contention that the constitutional provision in question is no part of the right but merely goes to the remedy. There can be no doubt that some of these cases uphold defendant's contention. A review of these cases seems unnecessary since many of them deal with the effect of statutes making a certain state of facts prima-facie evidence of negli-

gence, which theory, our Supreme Court apparently refused to follow in the Hiatt case, supra.

In view of what has been said this court has no power to declare that plaintiff's husband was guilty of contributory negligence as a matter of law and our former opinion on that question can no longer be followed. We must therefore hold that the question of contributory negligence was one for the jury.

The facts, however, should be fully stated in view of our holding in the former opinion. The public highway at the crossing where deceased was killed runs straight north and south and the railroad track runs from the southwest to the northeast on a curve to the north (one-quarter east and three-quarters north) of about one-quarter of a mile in a mile; the depot of Milfay is south of the railroad track and about 100 yards west of the highway; the railroad track is seven to ten feet higher than the highway as it approaches the railroad right-of-way and the highway reaches the crossing on a dump or embankment; this dump was so narrow that at a point some feet south of the crossing (the witnesses differing as to the exact distance) there was not room for vehicles, or more particularly, automobiles, to pass each other. There were weeds growing along the highway within defendant's right-of-way but, as we read the evidence, they did not materially obstruct the vision of persons using the highway after they reached, or started to ascend, the dump. At a point on the highway about thirty feet south of the crossing was a "STOP—STATE LAW" sign. The evidence shows a person approaching the crossing from the south, upon reaching the stop sign, could not see an automobile approaching the crossing from the north, which approach was likewise on a dump, when such automobile was about an equal distance from the crossing. On this phase of the case, plaintiff's witness, J. C. Townsend who at the time was a State highway patrolman, testified as follows: "Q. I will ask you to state whether or not, in approaching that railroad crossing from the south, you can see an automobile approaching the crossing from the north along that highway? A. When you first start over, no, you can't see one coming from the north. Going over from the south side you can't see one coming from the north side until you get up on the grade a piece." On cross-examination he testified as follows:

"The track is laid through there on a fill above the level of the rest of the ground. The dump or embankment I am taking about is the grade of the road that is laid up so that the road can go up and get up with the level of the tracks to pass over.

"There is no embankment or anything built up to the side that would keep a person from looking down the track. That fill starts its rise from the south side of the highway there back a little bit south of where the 'Stop, State Law' sign is, and then it keeps rising

on about a level until it gets up even with the tracks. On the north side of the track it is a little better shape than on the south side; it was then and is now, a little better shape than the south side, it was a longer grade and a little wider.

"Q. When you say a person driving an automobile toward the track on that road from the south going north cannot see an automobile driving toward that track from the north going south, you mean that before the two cars come up on this rise that they can't see each other; is that right? A. They can't see, no.

"Q. That is, when they are both back at the beginning of the rise they can't see? A. No.

"Q. As either one of them gets up close to the track, then they commence to get up with the level of the track and the other can see? A. Yes, sir.

"Q. A person in an automobile on the south side of the track, after they get up within thirty feet of the track would be able to see an automobile on the north side of the track that had gotten up within say twenty feet of the track, wouldn't they? A. Yes."

The accident happened about 9:30 in the morning. Deceased had taken a load of cotton to Milfay and was returning home driving his car in a southerly direction on the highway in question. He was familiar with the crossing since he had just driven over it. When he reached a point opposite the "Stop" sign and about 30 feet from the crossing, he stopped his car and probably looked and listened for a train. At that time another truck was approaching the crossing from the north upon a dump. The vision of deceased to the west was obstructed by the little depot. To the east his vision was unobstructed and, according to plaintiff's witness Townsend, he could have seen a train for a distance of "three or four telephone pole lengths." The only estimate given as to the distance between telephone poles was 200 feet. Other witnesses who saw the accident, who were situated south of the track, as was deceased, and some distance west, testified they saw the train coming while deceased was stopped. Learned counsel for plaintiff, in their original brief, practically conceded that deceased could have seen the train at that time and probably did. They took the position, however, that, "at the time he (deceased) stopped south of the track, he was in a more apparent and immediate danger from the approaching truck than from the train, and in attempting to avoid the danger he was in by reason of the truck approaching him, a collision resulted with the train." Under the view we have taken as to contributory negligence this question is now of no importance. The facts, however, should be fully stated in view of the contentions made. Horace Whitemore a witness for plaintiff, testified as follows:

"I was standing right in the middle of the depot; it is a box-car depot and I was right in the middle of it, in the center of the west end of it. I was looking east. When I looked out I saw this truck, this Graham truck, this produce truck, coming from the north, going up on the track. I noticed another truck stopped, I guess about ten feet from the tracks, on the south side. When I first noticed it standing there, the other truck coming up on the crossing, I noticed a train coming out of the cut. The train was east of the crossing some distance. As I looked at that train I did not hear any whistle or bell. I did not see any smoke coming up from the engine.

"Q. Now, when this Graham truck you saw go up onto the grade where the one was stopped on the south side, when he run up on top, was there room for them to pass where you saw the truck on the south side standing? A. No, sir; there was two ditches on each side of the road, and he had to pull up so they could pass. When the produce truck came on top he pulled over to the west side; had to, to let the other truck pass, and the other truck had to pull up. If he had of come straight across as I saw them there he could not have passed this man.

"Q. Now, then if Jackson, you say it turned out to be Jackson in this truck on the south side, didn't you, you later understood it was Jackson going north? A. Yes, sir.

"Q. Tell what danger he would have been in if he had of come on over and this Jackson hadn't pulled out; state what danger he would have been in by being struck by the train.

(Objection overruled.)

"A. You want to know what danger the produce truck would have been in?

"Q. Yes, sir; and Jackson, too? A. It was impossible for them to pass where Mr. Jackson was stopped. There was a ditch on each side; there wasn't room enough for both of them.

"Q. With the front of his car within ten feet of the tracks, would you say that other truck—would he have had room to clear where Jackson was standing? A. No, sir; I don't think so.

"Q. With his truck when he appeared on top there, or coming up to get on top, what did Jackson undertake to do there at that place where the other fellow couldn't get by him and couldn't get there clear? A. Jackson had to wait until he pulled in there. He pulled up from away from this place he was stopped, and it looked like he was—

"Q. To let the Graham truck in clear? A. Yes, sir; and they both have to cross right on the tracks, you might say, and it looked like he was kinda working with his brake or trying to do something when they passed.

"Q. Do you know if he was trying to stop or not? A. It looked like he was working on the brakes or something; he was bent over the steering wheel.

"Q. Whether he was trying to stop or pass on clear of this all you were not able to tell? A. I wasn't able to tell.

"Q. From the time it come out of the cut up there, the train come on down, did it strike those fellows or hit them? A. You mean, did it strike the fellows?

"Q. Hit anybody? A. Hit Mr. Jackson's truck.

"Q. Was he able to get there clear? A. No, sir.

"Q. What part of his truck did it hit? A. Front part, or the front wheels.

"Mr. Mann (Q.): Hit the front wheels, you say? A. Front part, between the cab and radiator, you might say. I saw Mr. Jackson's truck strike the back end of the produce truck; Mr. Jackson's truck as the train hit it. Struck back end of the produce truck. It didn't hurt the Graham truck so bad, just knocked a little piece of board off of the back of the bed. Mr. Jackson had a bed on his truck— he had been hauling cotton—big wide bed.

"Q. Knowing that approach as you do, was it possible for these two trucks to pass each other there? A. Not where Mr. Jackson stopped, it wasn't. They have to cross, you might say, on the tracks."

On cross-examination he testified deceased stopped opposite the "Stop" sign and that if the stop sign was thirty feet from the crossing then the truck was also about that distance when it stopped. He further testified as follows:

"Q. The other car got entirely across the track before the front end of the car got opposite Mr. Jackson's truck, didn't it? A. No, sir.

"Q. You tell the jury that the rear wheels of the produce truck were not south of the track at the time Jackson started? A. No, sir; not at the time he started to get on the track; no, sir.

"Q. At the time Jackson started where were the rear wheels of the produce truck? A. At the time Jackson started he was hit when the produce truck was even with Jackson's rear wheels.

"Q. How is that? A. He must have been hit at the time the produce truck was across the track and Jackson's front wheels on the track.

"Q. How far do you think the produce truck got south of the track before the train hit Jackson? A. He wasn't five feet.

"Q. And yet the train just struck the front end of Jackson's truck? A. Yes, sir.

"Q. And you say the produce truck hadn't got clear by Jackson? A. No, sir; it couldn't of because it took off a piece of the produce truck.

"Q. Did you see it take off a piece? A. No, sir; I looked at the truck.

"Q. You say there was a fresh break on the truck? A. Yes, sir.

"Q. You didn't see it break off? A. No, sir, it tore Jackson's truck up, sent part of it on the north side, the wheels, I think, and a tire or two, but the main part was pushed south and west of the crossing. I didn't see it move. 'From where I was watching I couldn't see anything hit the Graham truck.

"Q. And yet the Graham truck was west of Jackson's truck, wasn't it? A. Yes, sir.

"Q. And the train pushed Jackson's truck west, didn't it? A. Yes, sir—A . . . At the time Jackson started up that train was within one hundred or one hundred and fifty feet of the crossing, wasn't it? A. I couldn't say.

"Q. It was where he could have looked and seen it? A. Yes, sir; he could have probably looked.

"Q. At the time he was standing still and before he started up if he made one glance to his right he would have seen that train, wouldn't he? A. I don't know.

"Q. Do you know of anything to hinder that would keep him from seeing it? A. It was coming out of the cut when I seen it.

"Q. But that was before Jackson started up, that was when the other truck was still north of the crossing; that train kept moving towards the crossing after the first time you saw it, didn't it? A. Yes, sir.

"Q. Never did stop? A. No, sir.

"Q. It was four or five or six telegraph poles of the crossing, coming out of the cut when you first saw it, wasn't it? A. Sure was.

"Q. Jackson didn't start up then, did he? A. No, sir. Jackson started up when he gave this other fellow room to cross—before he was off the track.

"Q. Before he started up if he had looked at all to his right or to the northeast there wasn't a thing to keep him from seeing the train you saw? A. No; if he looked when he was about to pull on the track he could have seen it.

"Q. If he looked when he was standing still? A. He couldn't see it.

"Q. Do you know of anything to obstruct his view? A. Nothing but this truck.

"Q. The truck was on the left side and the train on the right? A. The truck was right at the track.

"Q. You say if there was anything that would obstruct his view there was nothing except the Graham truck? A. The Graham truck; yes, sir; after he stopped.

"Q. At the time he was stopped the Graham truck was in front of him? A. Yes, sir.

"Q. And the train was over to his right? A. Yes, sir.

"Q. You don't mean to tell this jury that produce truck would obstruct his view of the train? A. No; the produce truck is what he was watching."

Robert George testified for plaintiff as follows:

"I am 25 years old and I live at Milfay. When this accident happened I was about two hundred feet south of the railroad. When I first saw the truck on the track I was sitting in the barber shop on a paper box, by the window. I did not see the train coming when I looked out. When I first saw the truck, one of them was on the track and the other one about eight or ten feet, trying to pass.

"Q. They were trying to pass? A. About eight or ten feet on south side of the track.

"Q. Would it be possible—tell the jury, as you know the crossing —would it be possible for two trucks to pass? A. They couldn't pass without one pulling up.

"Q. Where would they have to get to pass? A. They would have to get forty or fifty feet before they could pass.

"Q. If they didn't pass forty feet north of that where could they pass? A. Right on the track; very near it.

"Q. Right up on the track. Now, while they were trying to pass there what happened to them? A. One of them got knocked off."

The foregoing contains substantially all the evidence most favorable to plaintiff except as to the condition of the highway. Without analyzing this evidence we believe that, in the absence of the Oklahoma Constitution Provision heretofore discussed, it convicted deceased of contributory negligence. There was sufficient evidence, we think to at least make a question upon which reasonable minds might differ as to whether or not defendant was negligent in operating its train and in the construction of the highway approaches to its track, and if such negligence was properly a part of plaintiff's case, it was a jury question.

The trial court refused to give defendant's instruction "E" withdrawing from the jury the question of the narrow condition of the roadway upon the dump over defendant's tracks. This is assigned as error. Plaintiff pleaded a statute of Oklahoma (sec. 5533, C. O. S. 1921), by the terms of which defendant railroad company was required to construct a crossing across its track, roadbed or right-of-way over which any public highway may run, and maintain same unobstructed and in good condition for use of the public. Defendant contends this statute was not intended as a protection against the particular injury complained of. The cases cited make such a distinction, but the Oklahoma Supreme Court has held this section may be made the basis of liability and the question of proximate cause thereby raised is one for the jury. [St. Louis-San Francisco Ry. Co. v. Miller, 245 Pac. 52.]

"While the statute above referred to does not require a railroad company to construct a crossing of any particular width, it does require it to be in good condition for use of the public. Whether or not the fact that the roadway in this case was so narrow that two vehicles could not pass thereon was a compliance with that statute and whether or not such condition was the proximate cause of the accident was, under the Oklahoma law, a question for the jury.

Complaint is made of other instructions but we find no merit in defendant's contention. Plaintiff's instruction No. 5 told the jury that, in the event of a finding for plaintiff, it should assess the damages with reference to the pecuniary loss sustained by the widow and three minor children and in determining this, "you may consider the probable earnings of deceased, his age, experience, health and bodily qualifications during what might probably have been his lifetime had he not been killed, etc." This instruction conformed to the law of Oklahoma. [Gypsy Oil Co. v. Green, 82 Okla. 147, 198 Pac. 851; Big Jack Mining Co. v. Parkinson, 41 Okla. 125, 137 Pac. 678.]

It is conceded, we think, that the measure of damages recoverable are governed by the law of the State in which the cause of action arises. [Buckles v. Ellers, 72 Ind. 220, 5 R. C. L. 1041, sec. 132.]

It is our opinion the case was fairly tried and we find no material error therein. The judgment is affirmed. *Cox, P. J.,* and *Smith, J.,* concur.